Richard J. Bernard
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, New York 10016-1314
Telephone: (212) 682-7474
Facsimile: (212) 687-2329


- and -

John P. Melko (*pro hac vice* pending)
**FOLEY & LARDNER LLP**
1000 Louisiana Street, Suite 2000
Houston, TX 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| HOOPER HOLMES, INC., *et al.*, | Case No. 18-_____(___) |
| Debtors.[1] | (Joint Administration Requested) |

----------------------------------------------------------------x

## DECLARATION OF JAMES E. FLEET IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James E. Fleet, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am the Chief Restructuring Officer of Hooper Holmes, Inc. and its debtor affiliates,

as debtors and debtors in possession  (collectively, "Debtors" or "Provant") in the above-captioned

case.  I was appointed to the position of the Debtors' Chief Restructuring Officer on March 25,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Hooper Holmes, Inc. (9359); Hooper Distribution Services, LLC (6838); Hooper Wellness, LLC (6005); Accountable Health Solutions, LLC (9625); Hooper Information Services, Inc. (4927); Hooper Kit Services, LLC (8378); and Provant Health Solutions, LLC (8511).  The location of the Debtors' corporate headquarters is 560 N. Rogers Road, Olathe, KS 66286.

2018.  My current duties include oversight and management over all aspects of the Debtors' financial and operational matters.

2.      On August 27, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

3.      As the Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' business operations and financial condition.  In discharging my duties, I have reviewed the Debtors' books and records, operations, and other information necessary to the restructuring sought to be effected by the Debtors.  My conclusions as to the objectives to be achieved through this chapter 11 case are set forth at the end of this Declaration.  As a result of my first-hand experience and through my review of the Debtors books and records and other information, I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in its "first-day" motions and applications filed concurrently with this Declaration.  The prosecution of these papers is necessary for the Debtors reorganization and to enable it to proceed effectively in this case.  The Debtors would be adversely affected if unable to obtain the relief sought therein.

4.      I submit this Declaration in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "LBRs") and in support of the Debtors' first-day motions and applications (the "First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinions based upon my experience and knowledge of the Debtors' operations and financial condition, or my consultation with the Debtors' professional advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Debtors to submit this Declaration.

5.      Part I of this Declaration describes the Debtors, their businesses, history,  need for chapter 11 relief.  Part II outlines the Debtors' debt and equity structure.  Part III outlines the events leading to these chapter 11 cases.  Part IV summarizes the Debtors' objectives in these chapter 11 cases.

## I. BACKGROUND OF THE DEBTORS

### I.      THE DEBTORS' OPERATIONS AND CORPORATE STRUCTURE

#### A.      The Debtors' Corporate History

6.      Hooper Holmes, Inc. ("Hooper Holmes"), founded in 1899, is a publicly-traded New York corporation whose shares of common stock are listed on the OTCQX (OTXQX: HPHW).  The Debtors are headquartered in Olathe, Kansas.  In 2015, Hooper Holmes acquired substantially all of the assets of Accountable Health Solutions, Inc.  In 2017, Hooper Holmes merged with Provant Health Solutions, LLC ("PHS").  Hooper Holmes and its direct and indirect subsidiaries operate in one reporting segment and do business as Provant Health.

#### B.      The Debtors' Business Operations

7.      The Debtors provide comprehensive health and wellbeing programs offered through organizations' sponsorship.  These services include on-site biometric screening services and flu shots, laboratory testing, health risk assessment, and sample collection services to, among others, corporate and government employers, health plans, wellbeing companies, and third party administrators.  Through the Debtors' comprehensive health and wellbeing services, the Debtors also provide health coaching to support positive health risk migration for individuals.  Together with their clients, the Debtors seek to improve healthcare, contain costs, and increase the wellbeing and productivity of employee populations.  The Debtors operate nationwide through a network of health professionals.

4842-9682-7505.3

3

8.      The Debtors sell their services direct to corporations, clinical research organizations and through a channel partner network.  The Debtors service approximately 30 channel partners, 200 direct clients representing nearly 3,000 employers representing over 3,000,000 individual employees.  In 2017, the Debtors delivered nearly 1,000,000 screenings.

9.      While the Debtors operate under one reporting segment, the Debtors have two distinct general ledger entities based on the services provided. The Debtors operate through two distinct business processes: (a) health and wellness coaching, portal, and screenings ("Wellness Services"), and (b) medical kit sales ("Kits").  The Wellness Services are the Debtors' primary source of revenues and generate the vast majority of the Debtors' revenues.  The Wellness Services are accounted for under the Hooper Holmes general ledger.

10.     The Kits are medical kits for sale to third parties and generate ancillary revenue for the Debtors.  The Kits are accounted for under the Hooper Kit Services, LLC ("HKS") general ledger.  The Kits business provides services to global pharmaceutical companies and is subject to federal regulations administered by the Food and Drug Administration.

11.     The Debtors provide healthcare screenings to facilitate wellness approaches administered by independent healthcare practitioners.  The Debtors also provide coaching in conjunction with such services.  Under no circumstances do the Debtors diagnose or treat any health-related or medical conditions.  Moreover, the administration of vaccines is conducted by independently contracted, licensed healthcare professionals under the direction of a physician's authorization.

## C.      The Debtors' Employees

12.     The Debtors employ approximately 326 employees.  Historically, including 2017 and anticipated one again in 2018, the Debtors engage over 4,700 health professionals from their

network of over 20,000 professionals.  The Debtors also engage a seasonal workforce which varies based on the timing and volume of the Debtors' screening services.

## II.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

13.    As set forth on the structure chart attached hereto as **Exhibit A**, the Debtor Hooper Holmes is the Debtors' ultimate parent and owns, directly or indirectly, each of the remaining Debtor subsidiaries.  Hooper Holmes and its subsidiaries are all U.S. entities.  All of these entities are either obligors or guarantors to all of the Debtors' structured debt under the Revolving Credit Facility and Term Loan Facility (as those terms are defined below).

### B.    Equity Structure

14.    Hooper Holmes in a publicly-traded New York corporation whose shares of common stock are listed on the OTCQX tier of the electronic quotation system operated by OTC Markets and traded under the symbol HPHW.  Prior to May 2, 2017, Hooper Holmes's common stock was traded on the New York Stock Exchange market.  As of March 29, 2018, there were approximately 685 holders of record of Hooper Holmes's common stock with its transfer agent, American Stock Transfer & Trust Company ("AST").  Much of Hooper Holmes's shares of common stock are held of record by brokers and other institutions on behalf stockholders.  The price range[2] for Hooper Holmes's common stock for the past three years is shown in the following table:

| Year | High | Low |
|------|------|-----|
| 2018 | $0.55 | $0.04 |
| 2017 | $1.10 | $0.41 |
| 2016 | $2.70 | $0.73 |
| 2015 | $9.45 | $0.90 |

---

[2] The stock price is rounded to the nearest penny.

15.    Hooper Holmes offers employee share-based compensation plans through two employee incentive plans providing for the grant of stock options, stock appreciation rights, non-vested stock awards, and performance shares.  The 2008 Omnibus Employee Incentive Plan provides for the issuance of an aggregate of 333,333 shares of Hooper Holmes and, as of June 30, 2018, 154,141 shares remained available for grant.  The 2011 Omnibus Employee Incentive Plan provides for the issuance of an aggregate of 3,650,000 shares of Hooper Holmes and, as of June 30, 2018, 592,893 shares remained available for grant.  Hooper Holmes also has outstanding warrants for the purchase of Hooper Holmes's common stock at determined prices.

16.    The Debtors' principal stockholders control a substantial portion of Hooper Holmes, with the Debtors' officers and directors and their affiliates beneficially owning approximately 53% of the outstanding shares of Hooper Holmes's common stock.  In particular, WH-HH Holdings, LLC, an affiliate of Century (as defined herein), owns 12,519,259 shares of Hooper Holmes's common stock, which represents approximately 46.77% of Hooper Holmes's outstanding common stock.  Further, John Pappajohn owns 2,145,930 shares of Hooper Holmes's common stock, which represents approximately 8.02% of Hooper Holmes's outstanding common stock.

### C.    The Debtors' Prepetition Indebtedness

17.    The Debtors' prepetition capital structure includes approximately $24 million in structured debt as of the Petition Date.  The Debtors' current structured debt consists of: (a) the Revolving Credit Facility, (b) the Term Loan Facility, and (c) the Subordinated Promissory Notes. The Revolving Credit Facility and Term Loan Facility are subject to an Intercreditor Agreement.[3] The Intercreditor Agreement governs the relative contractual rights of the lenders under the

Revolving Credit Facility and Term Loan Facility and the relative priority of CNH and SWK in the Debtors' collateral.

18.     The Debtors' prepetition indebtedness can be summarized as follows:

| Indebtedness | Principal Balance Outstanding |
|---|---|
| Revolving Credit Facility | $4,810,224 |
| Term Loan Facility | $17,657,000 |
| Subordinated Promissory Note | $1,916,998 |
| **Total** | **$24,384,212** |

These obligations are discussed further below:

Revolving Credit Facility

19.     In April 2016, Hooper Holmes entered into that Credit and Security Agreement with CNH, as amended (the "Revolving Credit Facility").[4]  The Revolving Credit Facility is an asset-based facility and provides the Debtors with proceeds for general working capital purposes and capital expenditures.  Under the Revolving Credit Facility, the Debtors may borrow up to $10 million with an accordion up to $15 million during high-volume months, at the discretion of CNH. Obligations under the Revolving Credit Facility are secured by substantially all of the Debtors' existing and after-acquired property, including, but not limited to, their receivables (which are subject to a lockbox account arrangement), inventory, and equipment.

---

[3] The "Intercreditor Agreement" means that certain Intercreditor Agreement, dated April 29, 2016, (as amended, modified, and supplemented from time to time).  by and between CNH Finance Fund I, L.P., f/k/a SCM Specialty Finance Opportunities Fund, L.P. ("CNH") and SWK Funding LLC ("SWK").

[4] The "Revolving Credit Facility" means that certain Credit and Security Agreement dated April 29, 2016, by and between SCM Specialty Finance Opportunities, Fund, L.P. and Hooper Holmes, Inc. and subsidiaries (as amended, restated, modified, and supplemented from time to time).

Term Loan Facility

20.     Hooper Holmes, as borrower, and SWK Funding LLC, as agent, sole lead arranger and sole bookrunner, are parties to that certain Amended and Restated Credit Agreement, amended and restated as of May 11, 2017 (as amended, restated, modified, or supplemented from time to time) (the "Term Loan Facility," and together with the Revolving Credit Facility, the "Prepetition Debt Facilities").  The Term Loan Facility provides the Debtors with additional working capital for general business purposes.

21.     Borrowings under the Term Loan Facility are secured by a security interest in the Debtors' existing and after-acquired property, including, but not limited to, their receivables (which are subject to a lockbox account arrangement), inventory, and equipment.  All of the other Debtors are guarantors of the obligations under the Term Loan Facility pursuant to that Amended and Restated Guarantee and Collateral Agreement, dated May 11, 2017 (as amended, restated, modified, or supplemented from time to time).

Subordinated Promissory Note

22.     Prior to entry of the Merger, Century Equity Partners ("Century") invested $2.5 million in PHS in the form of subordinated, convertible debt pursuant to that certain Subordinated Promissory Note, dated May 11, 2017, between Century and PHS (the "Subordinated Promissory Note").  Immediately prior to closing of the Merger, approximately $0.4 million of the balance of the Subordinated Promissory Note converted to equity in PHS.  The remaining approximately $1.9 million of the Subordinated Promissory Note remains outstanding as subordinated debt.  The Subordinated Promissory Note is unsecured and subordinate to the Revolving Credit Facility and the Term Loan Facility pursuant to the terms of the Subordinated Promissory Note.

Intercreditor Agreement

23.     Pursuant to the terms of the Intercreditor Agreement, the Revolving Credit Facility holds a first priority lien versus the Term Loan Facility with respect to the "Revolving Loan Priority Collateral," which includes, among other things, accounts and books and records.  The Revolving Credit Facility's priority in the Revolving Loan Priority Collateral is capped at $17.25 million.  The Term Loan Facility holds a first priority lien versus the Revolving Credit Facility with respect to all Debtors' assets not considered Revolving Loan Priority Collateral.

## III.

## EVENTS LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES

24.     The most significant factor leading to the commencement of these chapter 11 cases is the amount of debt on the Debtors' balance sheet.  As noted above, the Debtors have incurred year-over-year losses from operations with negative cash flows.  To fund the Debtors' operations, the Debtors' have incurred debt in the ordinary course.  Further, recent mergers and acquisitions by the Debtors have added significant debt to the Debtors' balance sheet, resulting in unsustainable leverage.  Out of court refinancing of the Revolving Credit Facility and the Term Loan Facility have been unsuccessful.

### A.     Mergers and Acquisitions

Accountable Health Solutions Acquisition

25.     In April 2017, Hooper Holmes acquired substantially all of the assets from Accountable Health Solutions, Inc. for approximately $7 million (the "AHS Acquisition").  The AHS Acquisition expanded the Debtors' capabilities to deliver telephonic health coaching, wellness portals, and data analytics and reporting services.  In order to fund the Acquisition, the Debtors entered into Term Loan Facility and increased their debt load by approximately $2 million.

PHS Merger

26.    In May 2017, Hooper Holmes closed on its merger with PHS, with PHS becoming a wholly-owned subsidiary of Hooper Holmes (the "Merger").  Through the Merger, the Debtors offer a personalized, one-stop programming experience for customers.  The Debtors expected that the Merger would increase scale, improve gross margins due to combined revenues and operations–producing operational synergies by reducing fixed costs.  While the combined Debtors expected financial conditions to improve at the Merger, PHS had a history of operating losses as well, and the Debtors incurred significant costs and additional debt for the Merger.  Further, the Debtors significantly overestimated their ability to create synergies in both time and cost, thereby resulting in a significant operating shortfall in 2017.  As a result, the Company entered into 2018 in a significant working capital shortfall as debt was used to fund these operating losses.

27.    In order to fund the Merger, the Debtors and SWK entered into the A&R Credit Agreement which increased the principle balance from $3.7 million to $6.5 million and provided the $2 million seasonal facility.  In addition, the Debtors and CNH amended the 2016 Credit and Security Agreement which expanded the Revolving Credit Facility from $7 million to $10 million with an accordion up to $15 million.  As a result of the Merger, the Debtors took on indebtedness substantially greater than that prior to the Merger.

28.    Despite the optimism from the AHS Acquisition and the Merger, the Debtors continued to have losses from operations and negative cash flows.  As of March 31, 2018, the Debtors had a working capital deficit of $31.5 million and operations did not indicate future positive cash flows.  To fund operations, the Debtors continue to rely on third party financing.

### B.    Prepetition Initiatives

29.    The Debtors have undertaken a number of initiatives in an effort to improve operating efficiency, performance, streamline costs, and improve their overall balance sheet profile, including: (a) implementing cost-cutting measures, (b) analyzing multiple strategic alternatives, including the sale of the Debtors' business, and potential capital market solutions, and (c) engaging key creditor constituencies.  The Debtors also engaged experienced advisors to assist in their evaluation and review of the process.

Cost Cutting Initiatives

30.    Cognizant of their strained financial position, the Debtors instituted cost initiatives to improve operations and address ongoing cash concerns.  In March 2018, the Debtors engaged the services of PMCM 2, LLC–a  subsidiary of Phoenix Management Services ("Phoenix") as turnaround professionals (the "CRO").  With the CRO, the Debtors implemented a working plan to restructure the Debtors' balance sheet, control and decrease operating expenses, and resolve other going concern issues.  As a result of these initiatives, the Debtors (a) renegotiated customer contracts to more favorable and profitable terms; (b) revised supply chain contracts with certain vendors to streamline the supply chain, obtain replacement vendors, and reduce costs; (c) eliminated redundancy in operations by consolidating operations, recalibrating cost of sale items, and reducing duplicative employment positions which are projected to achieve millions of dollars of annualized headcount savings.

Financing Alternatives

31.    The Debtors also explored various out-of-court restructuring alternatives to reduce overall indebtedness and consummate a value-maximizing transaction.  In January 2016, Hooper Holmes executed a rights offering to current shareholders to fund working capital, resulting in $3.4

million in net proceeds. Hooper Holmes also funded working capital through additional equity contributions totaling approximately $6.3 million through the remainder of 2016 and 2017.

<u>M&A Activity</u>

32.     Prior to the Petition Date, the Debtors commenced a marketing process for the sale of substantially all of their assets (the "<u>Transferred Assets</u>"). On August 27, 2018, the Debtors entered into an asset purchase agreement (the "<u>Stalking Horse APA</u>") with Summit Health, Inc. (the "<u>Stalking Horse Bidder</u>").[5] Pursuant to the terms of the Stalking Horse APA, the Debtors agreed to sell the Transferred Assets to the Stalking Horse Bidder (the "<u>Sale Transaction</u>") for $27 million in cash, plus the assumption of certain liabilities, subject to certain adjustments (the "<u>Consideration</u>").

33.     Importantly, the Stalking Horse APA provides that the Debtors will assume and assign to the Stalking Horse Bidder certain executory contracts and leases (the "<u>Assumed Contracts</u>") in connection with the Transferred Assets. Moreover, within one day of the execution of the Stalking Horse APA, the Stalking Horse Bidder will deposit $2.7 million in escrow. Upon a closing, the deposit will be credited against the Consideration. The Debtors and the Stalking Horse Bidder expect to close the Sale Transaction in early October, subject to customary closing conditions and approval by the Court.

34.     Thanks, in large part, to fruitful negotiations among the Debtors, the DIP Lenders, and the Stalking Horse Bidder, the Debtors are, at the outset of these chapter 11 cases, able to

---

[5] Contemporaneously herewith, the Debtors filed the *Motion of Debtors for Entry of (I) an Order Approving (A) Bidding Procedures, (B) Stalking Horse Asset Purchase Agreement and Bid Protections, (C) Form and Manner of Notice of Auction, Sale Transaction, and Sale Hearing, and (D) Assumption and Assignment Procedures, and (II) an Order Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Entry Into Asset Purchase Agreement, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "<u>Sales Motion</u>").

present the Court with the Stalking Horse APA, which contemplates a competitive sale process that will generate significant proceeds for the benefit of the Debtors, their estates, and their creditors.

### Prepetition Marketing and Sales Process

35.     The Debtors' pursuit of a going-concern sale transaction began in the second quarter of 2018, following a thorough diligence process by the Debtors, Hooper Holmes's board of directors (the "Board"), and their Chief Financial Officer–Phoenix regarding strategic alternatives and an evaluation of all options available to the Debtors in light of its growing liquidity concerns.  On May 8, 2018, the Debtors engaged Raymond James & Associates, Inc. ("Raymond James") to serve as its investment banker and to market substantially all of its assets.

36.     Through this marketing process, the Debtors and Raymond James contacted approximately 259 potential buyers, including 90 strategic buyers (i.e., operating companies interested in expanding their presence in the health-screening and corporate-wellness services industry) and 169 financial buyers (i.e., such as private equity firms), with the aim of attracting one or more bidders for the Debtors' businesses or assets.  During this process, interested buyers executed confidentiality agreements ("NDA") and were provided with confidential information describing the Debtors' businesses and communicated with Raymond James with respect to preliminary diligence questions.  As a result of these extensive marketing efforts, the Debtors received four initial indications of interest for substantially all of the Debtors' assets.  In evaluating the proposals, the Debtors and Raymond James analyzed, among other things: (i) the consideration offered by each potential buyer; (ii) assets to be acquired, liabilities to be assumed, and proposed treatment of and effect on the Debtors' labor agreements and related obligations; and (iii) execution risk.

37.    During a second and final round of bidding, which lasted from July 11, 2018 until August 15, 2018, the Debtors provided these bidders with management presentations and access to an electronic data room containing significant diligence and other confidential information about the Debtors' businesses.  Over the course of this round, the Debtors and Raymond James continued negotiating with the remaining bidders to increase the value of the bids received.

38.    After the completion of the second and final round of bidding, the Debtors received final bids for substantially all of the Debtors' assets.  The Debtors, the Board, and their advisors continued negotiations with these bidders in order to determine the optimal path forward.  After extensive deliberations, significant negotiations with the Stalking Horse Bidder, and multiple rounds of revisions to the terms of the bid, the Debtors and the Board concluded that they had received the best possible bid for the Transferred Assets as a going concern that would maximize value for all of the Debtors' stakeholders.  As a result, the Board decided to proceed with the Stalking Horse Bidder's bid as reflected in the Stalking Horse APA (the "Stalking Horse Bid").

**Stalking Horse APA**

39.    The Stalking Horse APA represents a binding bid for substantially all of the Debtors' assets.  As set forth above, the total Consideration to be realized by the Debtors is $27 million, plus the assumption of certain liabilities, subject to certain adjustments.  In addition, pursuant to the terms of the Stalking Horse APA, the Stalking Horse Bidder and the Debtors will execute a transition services agreement (the "TSA"), whereby the Debtors will provide interim services to the Stalking Horse Bidder.  The TSA not only ensures a smooth post-closing transition of the Debtors' business, but also preserves a number of key jobs for existing employees of the Debtors at least through December 31, 2018.

40.     The Transferred Assets include, among other things, the Assumed Contracts and certain real property, inventory, deposits, furniture and equipment, intellectual property, books and records, and permits.  In the event that the sale to the Stalking Horse Bidder is consummated, the Debtors will assume and assign the Assumed Contracts to the Stalking Horse Bidder.  With respect to cure costs to be paid in connection with the assumption and assignment of the Assumed Contracts (the "Cure Costs"), (a) the Stalking Horse Bidder is responsible for paying the first $300,000 of Cure Costs, (b) the Debtors are responsible for paying all Cure Costs in excess of $300,000 and less than $600,000, and (c) in the event that Cure Costs exceed $600,000, the Stalking Horse APA provides that (x) the Debtors and the Stalking Horse Bidder will negotiate in good faith to determine the party responsible for paying Cure Costs in excess of $600,000, and (y) the Debtors and the Stalking Horse Bidder may terminate the Stalking Horse APA if they cannot agree on the responsibility for payment of the excess Cure Costs.

41.     In the event it is not the winning bidder at an auction (if one is held), the Stalking Horse Bidder has agreed to act as a "Back-up Bidder" and, as such, hold open its binding offer to purchase the Transferred Assets for a period of time after the Auction in case the winning bid at the Auction is not consummated.

42.     The Stalking Horse APA includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Bidder, as well as certain conditions to closing and rights of termination.  The Stalking Horse APA also includes covenants, conditions, and termination rights related to events in these chapter 11 cases.  The transactions contemplated by the Stalking Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Order (each as defined in the Sales Motion).

43.     I believe that the Stalking Horse APA constitutes the best offer available for the Transferred Assets at this time.  It is my opinion that subjecting the Stalking Horse Bid to the competitive bidding and auction process established by bidding procedures will enable the Debtors to realize the highest and best value available for the Transferred Assets.

**Bid Protections and Bidding Procedures**

44.     Bidding Procedures and the Stalking Horse APA contain certain bid protections, including an initial overbid requirement and subsequent bid increments and the Break-Up Fee and Expense Reimbursement (collectively, the "Bid Protections").  The Bid Protections were heavily negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arms' length and in good faith and were necessary to secure the Stalking Horse Bidder's commitment to purchase the Transferred Assets.  The Bid Protections, collectively and individually, are fair and reasonable, will not chill bidding, and will enable the Debtors to maximize value through a sale process.

45.     The Stalking Horse APA also includes a provision for the payment of a break-up fee representing 3.5% of the Purchase Price (the "Break-Up Fee") and an expense reimbursement up to a cap of $300,000 (the "Expense Reimbursement"), as an administrative expense, upon the termination of the Stalking Horse APA, payable in accordance with the terms thereof.

46.     The Break-Up Fee and Expense Reimbursement, which were material inducements for the Stalking Horse Bidder to make a binding bid that will serve as a floor price at any auction, is: (i) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; and (ii) fair, reasonable, and appropriate in light of the size and nature of the proposed sale and the efforts that have been and will be expended by the Stalking Horse Bidder.

**Need for Timely Sales Process**

47.    The Debtors believe that the auction procedures and time periods set forth in the

Bidding Procedures (as defined in the Sales Motion) are reasonable and will provide parties with

sufficient time and information to submit a bid for the Transferred Assets.  In formulating these

procedures and time periods, the Debtors' balanced the need to provide adequate and appropriate

notice to parties-in-interest and potential purchasers with the need to quickly and efficiently sell its

assets while they have realizable value and can be maintained as a going concern.  Furthermore,

potential bidders have had, and will, in accordance with bidding procedures approved by the Court,

continue to have access to comprehensive information prepared by the Debtors and its advisors and

made available in an electronic data room.

48.    Any delay in the sale of the Transferred Assets could result in further deterioration

and ultimate loss of the Debtors' going concern value, which could result in the loss of jobs for

most, if not all, of the Debtors' employees.  In contrast, approval of bidding procedures in

connection with the Sale Transaction will enable the Debtors to conduct an efficient process to

realize their going concern value, maximize recoveries for the Debtors' creditors, and preserve jobs.

For these reasons, the Debtors have determined that a sale, conducted in accordance with Court-

approved bidding procedures, is in the best interests of the Debtors' estates.

49.    Further, the Stalking Horse APA and the DIP Agreements impose strict milestones on

the Debtors to accomplish various objectives in a prompt and timely manner, including milestones

and termination events tied to the Sale Transaction.  There are at least three exigencies requiring an

expedited timeline for the Sale Transaction.  *First*, October is a significant revenue-generating

month for the Debtors, making an expedited closing essential to maximizing the value of the Sale

Transaction for the benefit of the Debtors' estates. *Second*, due in part to the first point above, the Stalking Horse APA provides that the cash consideration amount of $27 million decreases by $150,000 for ***each day*** that the sale closing is delayed after October 10, 2018. *Third*, the financing provided by the DIP Lenders requires that the sale close no later than October 26, 2018. In addition, the Debtors believe that the immediate sale of their assets as a going concern is the best possible way to avoid a piecemeal liquidation, especially in light of the limited post-petition financing available to the Debtors in these chapter 11 cases.

50.     The Debtors believe that the proposed timeline in their proposed Bidding Procedures provides them with the longest possible marketing period that complies with the milestones and termination events set forth in each of the Stalking Horse APA and the DIP Agreements, while preserving due process considerations in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

51.     In addition, absent the sale process contemplated by the Sale Motion, the Debtors will be unable to realize the maximum value of the Transferred Assets for the benefit of all stakeholders. Based upon my review of the Debtors' operations and finances, I have concluded that the Debtors' revenues are insufficient to support the continued operation of the Transferred Assets in light of the capital investments that are required to maintain competiveness and the debt service required by the Debtors' existing capital structure. Thus, a prompt sale of the Transferred Assets is necessary to ensure that such assets are sold at their going concern value prior to further deterioration in revenues and profitability, and loss of liquidity necessary to operate the Debtors' business.

Stakeholder Engagement

52.     In this process, the Debtors also engaged with their significant creditors with the goal of building consensus around a de-leveraging transaction if reasonably possible. These stakeholder

contingencies included CNH and SWK.  These discussions have included, among other things: (a) the provision of a substantial amount of diligence to those parties and their advisors; (b) ongoing dialogue and communication around the Debtors' operations and prospects; and (c) regular in-person and telephonic meetings to discuss the Debtors' potential restructuring path.  Among other things, the Debtors have sought to engage these parties around both M&A-focused and "standalone" restructuring alternatives.  To date, those negotiations have not resulted in global consensus around the Debtors' ultimate restructuring, and the Debtors look forward to continuing this engagement and driving toward a consensus if at all reasonably possible.

DIP Financing

53.    Simultaneous with the Debtors' Sale Transaction marketing process, the Debtors and their advisors worked to ensure that ample liquidity would be available should the Debtors commence a formal chapter 11 proceeding. The Debtors determined that additional financing is necessary in order to: (a) fund working capital requirements and other operational expenses in connection with the ordinary course operation of the Debtors' business; (b) provide an appropriate liquidity cushion for anticipated vendor contraction and tightening of trade terms, which began prior to the commencement of these chapter 11 cases; (c) address the potential negative impact on customer collections arising from the commencement of these chapter 11 cases; (d) send a strong market signal that these chapter 11 cases are well-funded; (e) provide a stable platform for their businesses; (f) fund the Debtors' pursuit of a value-maximizing transaction for the benefit of their stakeholders; and (g) satisfy the administrative expenses to be incurred. As such, the Debtors determined that they required immediate access to stave off what would be substantial damage to their operations.

54.     Recognizing the financing need, the Debtors, with the assistance of Raymond James and their other advisors, undertook a marketing process that involved discussions with a variety of financial institutions, lenders, and CNH and SWK, the Debtors' incumbent secured lenders.  In this process, the Debtors solicited proposals for debtor-in-possession financing from their CNH and SWK and twelve additional parties, including five commercial banks and seven alternative lenders. Nine lenders declined to submit a term sheet before executed an NDA, citing an expected priming fight as one of the main reasons for not participating.  Three parties executed NDAs and reviewed the materials, but did not submit term sheets

55.     Raymond James, together with the Debtors, identified these potential lenders based on a number of factors, including, among other things, their ability to complete diligence quickly, experience providing debtor-in-possession financing, and their knowledge of the Debtors' complex business operations.  Ultimately, the Debtors only received debtor-in-possession financing proposals from CNH and SWK, the Debtors' prepetition secured lenders.

56.     Following negotiation with CNH and SWK, the Debtors are pleased to report that the process has been a success.[6]  CNH and SWK (together, the "DIP Lenders"), the lenders under the Prepetition Debt Facilities have agreed to continue to provide post-petition debtor-in-possession financing, pursuant to the terms of certain agreements (collectively, the "DIP Agreements"), in the aggregate amount of $13.6 million.  Specifically, CNH has agreed to continue to provide a $12.0 million postpetition DIP revolving facility on terms similar to those provided under the Revolving Credit Facility (the "DIP Revolving Facility").  In addition, SWK has agreed to provide $1.6 million

---

[6] Contemporaneously herewith, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, Granting Senior Postpetition Security Interests and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "DIP Motion").

in a term loan facility on terms similar to those provided under the Term Loan Facility (the "<u>DIP Term Facility</u>," and together with the DIP Revolving Facility, the "<u>DIP Facilities</u>").

57.     The proposed DIP Facilities represent a negotiated resolution with the lenders under the Debtors' Prepetition Revolving Credit Facility and Term Loan Facility, where the Debtors are able to obtain a substantial financing package on market terms and without overly burdensome case controls.   The DIP Facilities provide the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.   Under the DIP Agreements, the Debtors agreed, subject to Bankruptcy Court approval, to pay certain fees to the DIP Agent (as defined in the DIP Motion) and the DIP Lenders.   The Debtors and the DIP Lenders agree that these fees are an integral component of the overall terms of the DIP Facilities, and required by the applicable DIP Lenders as consideration for the extension of postpetition financing

58.     The DIP Facilities will provide sufficient liquidity to fund these chapter 11 cases and the Debtors' general corporate operations, finance operational restructuring and cost-savings initiatives, and, importantly, make payments to the Debtors' vendors and other participants in the Debtors' supply chain.   Ultimately, the DIP Facilities will give the Debtors the funds necessary to maintain enterprise value while it consummates a value-maximizing transaction.

59.     Entry into the DIP Facilities, along with the sale process described in the Sale Motion, is the only reasonable path forward that avoids a liquidation of the Debtors' businesses. Preserving value for the benefit of the Debtors' estates depends, in large part, on the Debtors' consummating a value-maximizing sale of their assets and maintaining operations in the ordinary course during the pendency of the Sale Transaction.  The Debtors are only able to maintain ongoing business in the ordinary course with the financing from the DIP Facilities.

60.     Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without the DIP Facilities, the likely alternative available to these chapter 11 cases would be an expedited liquidation of the Debtors' assets rather than the Debtors' continued operation as a going concern.

## II.

## DEBTORS' OBJECTIVES IN
## THESE CHAPTER 11 CASES

61.     Considering the circumstances discussed above and guided by the Debtors' goal of maximizing value, the Debtors, in consultation with their advisors, have elected to commence these chapter 11 cases to right-size their balance sheet and/or effectuate a value-maximizing transaction for the sale of the substantially all of the Debtors' assets.

## III.

## JURISDICTION

62.     Hooper Holmes was formed under the laws of the State of New York in 1906, and has maintained its existence as a New York corporation since formation.  As such, the Debtors commenced these chapter 11 cases in the Southern District of New York.  The Debtors submit that venue is proper in the Southern District of New York because Hooper Holmes is a New York corporation and, therefore, is deemed to be domiciled in the State of New York.  The Debtors also have ties to the Southern District of New York in particularly because, among other things: (a) the Term Loan Facility is governed by New York law and provides for venue in non-bankruptcy matters in either New York County or the U.S. District Court for the Southern District of New York; and (b) the Revolving Credit Facility is governed by New York law and provides for venue in non-

bankruptcy matters in New York state or federal courts.  Hooper Holmes is the ultimate parent and reporting entity for the Debtors and wholly-owns all of the other Debtors directly or indirectly.

## IV.

## THE FIRST DAY MOTIONS

63.    Contemporaneously herewith, the Debtors have filed the First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects of the commencement of these Chapter 11 Cases, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  A description of the relief requested in, and the facts supporting each of, the First Day Motions is set forth in **Exhibit B** attached hereto and incorporated by reference.

64.    I am familiar with the content and substance of the First Day Motions. I believe approval of the relief sought in each of the motions is critical to successfully implementing the Debtors' chapter 11 strategy efficiently and with minimal disruption to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

## V.

## INFORMATION REQUIRED BY LBR 1007-2

65.    LBR 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as Exhibit C through Exhibit N. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[7]

---

[7] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies

i. Pursuant to LBR 1007-2(a)(3), **Exhibit C** hereto provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

ii. Pursuant to LBR 1007-2(a)(4), **Exhibit D** hereto provides the following information with respect to each of the holders of the Debtors' thirty (30) largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

iii. Pursuant to LBR 1007-2(a)(5), **Exhibit E** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

iv. Pursuant to LBR 1007-2(a)(6), **Exhibit F** hereto provides a summary of the Debtors' assets and liabilities.

v. Pursuant to LBR 1007-2(a)(7), **Exhibit G** hereto provides a summary of the publicly held securities of the Debtors.

vi. Pursuant to LBR 1007-2(a)(8), **Exhibit H** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

vii. Pursuant to LBR 1007-2(a)(9), **Exhibit I** hereto provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

viii. Pursuant to LBR 1007-2(a)(10), **Exhibit J** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

---

between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

ix.  Pursuant to LBR 1007-2(a)(11), **Exhibit K** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

x. Pursuant to LBR 1007-2(a)(12), **Exhibit L** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

xi. Pursuant to LBR 1007-2(b)(1)-(2)(A), **Exhibit M** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

xii. Pursuant to LBR 1007-2(b)(3), **Exhibit N** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Dated:  August 27, 2018

_____/s/ *James E. Fleet*_____
Name:  James E. Fleet
Title:  Chief Restructuring Officer

**Exhibit A**

**Organizational Structure**



**Exhibit B**

**Evidentiary Support for First Day Pleadings**

4842-9682-7505.3

## I.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[8]

### A.    *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>")

1.    The Joint Administration Motion seeks administrative consolidation of their separate bankruptcy proceedings.  All of the Debtors are either directly or indirectly owned by Hooper Holmes, Inc. and are affiliates of one another.

2.    Joint administration of these bankruptcy cases is warranted by the fact that (i) the financial affairs and business operations of the Debtors are closely related, and (ii) administrative expenses are shared by the Debtors.  Entry of an order directing joint administration of these bankruptcy cases will obviate the need for duplicative notices, applications and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their respective estates.

### B.    *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* (the "<u>Case Management Motion</u>")

1.    Pursuant to the Case Management Motion, the Debtors seek entry of an order approving and implementing the notice, case management, and administrative procedures.  The proposed Case Management Procedures, among other things: (a) establish requirements for filing and serving Court Filings; (b) delineate standards for notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Bankruptcy Court.  Given the complexity of these chapter 11 cases, implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.

---

[8] Capitalized terms used in this section, but not defined herein have the meaning ascribed in the relevant First Day Motion.

**C.**    *Debtors Motion for an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Waiving Requirements to File List of Equity Holders* (the "<u>Schedules and Statements Extension Motion</u>")

1.      The Debtors filed a motion (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions and (b) waiving the requirements to file lists of equity security holders, as set forth in Fed. R. Bankr. P. 1007(a)(3).

2.      Given the size and complexity of the Debtors' business and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.  No party in interest will experience prejudice by the Court granting the Debtors' request for an extension.  Further, the Debtors have provided due notice to equity holders of the commencement of these cases.

**D.**    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases, and (IV) Requesting Related Relief* (the "<u>Matrix Motion</u>")

1.       Through the Matrix Motion, the Debtors are seeking authority to: (a) prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor (the "<u>Creditor Matrix</u>"), (b) file a consolidated list of the Debtors' 30 largest unsecured creditors, and (iii) mail initial notices through their Proposed Claims and Noticing Agent; (b) authorizing the

Debtors to redact certain personal identification information for individual creditors; and (c) approving the form and manner of notifying creditors of commencement of these chapter 11 cases.

2.    The preparation of separate lists of creditors for each debtor would be expensive, and time consuming. As such, the Debtors have requested to file a consolidated creditor matrix.  Filing a top 30 list will help alleviate administrative burdens, costs, and the possibility of duplicative service.  Also, the list of creditors may include information of individual creditors with personal information; such information can be used to perpetrate identity theft.   Further, mailing initial notices of bankruptcy through the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC ("Epiq"), to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Bankruptcy Court and the U.S. Trustee

> **E.**    ***Application of Debtors Pursuant to 28 U.S.C. §156(c), 11 U.S.C. § 503(b)(1)(A), and Local Rule 5075-1 for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Notice and Claims Agent* (the "Claims Agent Application")**

1.      The Debtors have requested the approval of a services agreement between the

Debtors and Epiq,[9] and the Debtors' retention and employment of Epiq as claims and noticing agent

for the Debtors in lieu of the United States Bankruptcy Court for the Southern District of New York,

effective *nunc pro tunc* to the Petition Date.  The Debtors anticipate that there will be more than

10,000 entities to be noticed in these cases.  In view of the number of anticipated claimants and the

complexity of the Debtors' businesses, the Debtors submit that the appointment of the Claims and

Noticing Agent is both necessary and in the best interests of their estates and creditors because the

Debtors will be relieved of the burdens associated with Claims and Noticing Services.  Accordingly,

the Debtors will be able to devote their full attention and resources to maximize value for their

stakeholders and facilitate the orderly administration of these chapter 11 cases.

**F.      *Debtors Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors
to (a) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses,
and (b) Continue Employee Benefits Programs, and (ii) Granting Related Relief
(the "Wages Motion")***

1.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a)

authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation,

and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of

business, including payment of certain prepetition obligations related thereto.

2.      The Debtors employ approximately 556 individuals (the "Employees"), 227 on a full-

time basis and 329 on a part-time basis. Approximately 443 Employees are paid on an hourly basis

and approximately 113 Employees receive a salary. None of the Employees are represented by a

union or collective bargaining unit.

3.      In addition to the Employees, the Debtors also retain a variety of specialized

---

[9] The Claims Agent Application is supported by a separate declaration of Brian Karpuk of Epiq.

individuals as independent contractors (the "Independent Contractors") to complete discrete projects. The Debtors currently retain approximately 3014 Independent Contractors in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors are a critical supplement to the efforts of the Debtors' Employees.

4.      To minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes, and 401(k) contributions), health insurance, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, severance, relocation assistance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

5.      The Debtors have identified eight Employees who are owed prepetition Employee Compensation and Benefits in amounts exceeding $12,850, the priority expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Four of these Employees constitute "insiders" as defined by section 101(31) of the Bankruptcy Code.  The Debtors seek to pay the non-insider Employees the full amount of their usual wages, commissions, and similar "paycheck-type" compensation, along with each Employee's health and welfare benefits for the pay period.  The Debtors do not seek to pay these non-insider employee's for accrued paid time off or severance benefits under the Wage Motion. By omitting these amounts, most of the non-

insider employees are below the statutory priority cap of $12,850.  For the avoidance of doubt, the Debtors do not seek to pay any insider Employee's in excess of $12, 850 pursuant to the Wage Motion, nor do the Debtors seek to pay any incentives or severance to the insider Employees under the Wage Motion.

6.      The Employees provide the Debtors with services necessary to conduct the Debtors' business, and absent the payment of the Employee Compensation and Benefits owed to the Employees, and Independent Contractors, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The Debtors occupy a very specific niche in the health and wellness market, a highly specialized business that requires unique technical expertise. I believe that without these payments, the Debtors' workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees and Independent Contractors. Such individuals may then elect to seek alternative employment opportunities.

7.      Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their workforce as the Debtors seek to operate their business in these chapter 11 cases.

**G.    *Debtors Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and Books and Records, (II) Authorizing Continued Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion")**

1.    The Debtors seek entry of interim and final orders to: (a) continue using their cash management system (the "Cash Management System"); (b) honor certain prepetition obligations related thereto; (c) maintain existing business forms; and (d) honor intercompany transactions in the ordinary course of business on a postpetition basis.

2.    The Debtors' Cash Management System is an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of seven operating bank accounts and three lockbox depository accounts (collectively, the "Bank Accounts") owned by the Debtors and maintained with Central Bank of the Midwest ("Central Bank"), Silicon Valley Bank ("SVB"), and Wells Fargo Bank, N.A. ("Wells Fargo"). The Debtors' accounting department, located primarily in Olathe, Kansas, maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

3.    The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors. Any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

4.    Prior to the Petition Date, the Debtors' primary bank account was maintained at Central Bank, where the Debtors maintain four of the Bank Accounts noted above. In anticipation of these chapter 11 cases, the Debtors opened three Bank Accounts at SVB to place the debtor-in-

position funds in the U.S. Trustee approved depositories (collectively, the "<u>New SVB Accounts</u>"). The Debtors intend to use the New SVB Accounts to replace the disbursement accounts maintained at Central Bank on a postpetition basis.

5.      On a prepetition basis, the Debtors primarily utilized the a main operating account held at Central Bank as its operating account (the "<u>Main Operating Account</u>") for payments (e.g., wires, ACH, and checks), transfers between the Debtors' Bank Accounts, and deposits for loan funding from the Debtors' structured debt facilities.  Prior to the Petition Date, the Debtors opened an operating account at SVB for the specific purpose of being a debtor-in-possession bank account during the pendency of these chapter 11 cases (the "<u>DIP Account</u>").  The DIP Account will perform all postpetition functions that the Main Operating Account performed on a prepetition basis.

6.      **Cash Receipts and Revenues.**  The Debtors' receipts and revenues are deposited into their various Bank Accounts.  The Debtors primary receipts are through (a) accounts receivable payments received from customers and (b) funding from the Debtors' Revolving Credit Facility and Term Loan Facility.  All Debtor cash receipts primarily from accounts receivable, other than HKS's accounts receivable, are sent to the Wells Fargo lockbox accounts.  The funds in the Wells Fargo Lockbox Accounts are then swept to an account controlled by CNH to pay down the amount outstanding under the Revolving Credit Facility.  With respect to the HKS, the HKS lockbox account receives funds from accounts receivable for the HKS business.  These funds are then swept nightly from the HKS lockbox to HKS's operating account Operating Account.  As for funding under the Revolving Credit Facility, the Debtors request funds from CNH to draw against that facility.  Once the draw is approved, the funds are deposited in the Main Operating Account from CNH.  The Debtors may also request funds under the Term Loan Facility, with such funds being deposited in the Main Operating Account.

7.      **Cash Disbursements.**  The Debtors primary disbursements are through (a) paying vendors and service providers through the accounts payable process; (b) paying payroll for corporate, health professional employees, and health professionals contractors; and (c) payments under the Revolving Credit Facility and Term Loan Facility.  The Bank Accounts are primarily funded through the Main Operating Account.  For accounts payable, funds are paid to vendors and service providers from the Main Operating Account or HKS's operating account.  For payroll, disbursement are either made through (a) the Main Operating Account, (b) Hooper Information Services, Inc's disbursement account (the "HIS Disbursement Account") for health professional employees, or (c) the disbursement account maintained at SVB for contract health professionals (the "SVB Account").  Payroll under the HIS Disbursement Account and the SVB Account are funded through interbank transfers or wire transfers from the Main Operating Account.  The Debtors also make payments under the Revolving Credit Facility and Term Loan Facility from funds available in the Main Operating Account.  The disbursements are either paid directly to CNH or SWK, as applicable, or by a wire transfer from the Main Operating Account to one of the lockboxes maintained at Wells Fargo.

8.      In the ordinary course of business, the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, lockbox fees, and other fees, costs, and expense (collectively, the "Bank Fees").  Central Bank takes out Bank Fees directly from the available funds in the relevant Bank Account.  In addition, the Debtors wire funds to Wells Fargo to pay for the Wells Fargo Bank Fees.  The Debtors estimate that the cumulative Wells Fargo Bank Fees are approximately $3,000 per month, depending on transaction volume.  Further, the SVB Bank Fees are approximately $300 per month, per SVB Bank Account.  The Debtors do not believe that

there are any prepetition Bank Fees outstanding as of the Petition Date, but there could be certain Bank Fees charged but not paid as of the Petition Date.

9.      Further, the Debtors have the capability of providing certain employees with access to purchase cards (the "Purchase Cards") issued by American Express (the "Purchase Card Program"). The Purchase Cards, if issued, would be utilized for approved business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business. Costs incurred through use of the Purchase Card, in turn, would be debited on a monthly basis.

10.     The Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "Books and Records").  If the Debtors are required to order new Business Forms and Books and Records, the Debtors will encounter  significant disruption to their business operations and unnecessary expenses that would result from a disruption of the Cash Management System.

11.     The Debtors operate as a nationwide enterprise and are consolidated under HHI for public reporting purposes.  For internal accounting and general ledger purposes, the Debtors are separated based on business function.  As such, depending on the business function, certain Debtors will report under one combined general ledger and other Debtors will report under another–with the Debtors being consolidated under Hooper Holmes for public reporting purposes.  For purposes of the Cash Management System, the Debtors operates under either the Hooper Holmes or HKS general ledger entities.  The Debtors record cash transfers between Hooper Holmes's Main Operating Account and HKS's two Bank Accounts as intercompany transactions.  The Debtors do not record

cash transfers between Hooper Holmes's Main Operating Account and the other non-HKS Bank Accounts because those transactions are accounted for under Hooper Holmes's combined general ledger.

12.     In in the ordinary course of business, the Debtors engage in intercompany financial transactions, in the ordinary course of their business (the "Intercompany Transactions").  At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor.  For example, in the normal course of business, Hooper Holmes transfer funds out of the Main Operating Account into HKS's Operating Account and Lockbox.  Also, HKS transfers funds out of the HKS Operating Account into Hooper Holmes's Main Operating Account.  The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis, consistent with their prepetition accounting practices, and can ascertain, trace, and account for the Intercompany Transactions on demand.  Discontinuing the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders.

**H.**    ***Debtors' Motion For Entry of Interim and Final Orders (i) Authorizing the
Payment of Certain Prepetition Taxes and Fees, and (ii) Granting Related Relief***
(the "<u>Taxes Motion</u>")

1.      Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders

authorizing the Debtors to remit and pay certain prepetition taxes and fees that will become payable

during the pendency of these chapter 11 cases. The Debtors estimate that their known and

determined prepetition liability for taxes, and reinstatement or business fees is approximately

$163,510.91. Of this amount, approximately $10,835.63 will become due and owing during the

interim period.

2.      The Debtors collect, withhold, and incur sales, use, income, franchise, severance, and

property taxes, as well as other business, environmental, and regulatory fees. The Debtors remit the

Taxes and Fees to various federal, state, and local governments, including taxing and licensing

authorities. Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds

transfers that are processed through their banks and other financial institutions.

3.      As discussed in the Motion, the Debtors have a number of delinquent prepetition tax

obligations, a substantial portion of which are unknown in amount.  These delinquencies are largely

due to disruptions from staff turnover. The Debtors are expending significant effort to audit and

bring their tax filings and records up to date and believe they will gain a much more complete

understanding of their prepetition and postpetition tax liabilities as these chapter 11 cases proceed.

As a result, in addition to seeking authority to postpetition and currently known prepetition Taxes

and Fees, the Debtors seek approval of streamlined notice and objection procedures to address the

likely numerous prepetition tax obligations the Debtors will identify and determine during the

pendency of the chapter 11 cases.

4.      Failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. *First*, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process. *Second*, failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. *Third*, failing to pay certain of the Taxes and Fees, particularly franchise taxes, would likely cause the Debtors to lose their ability to conduct business in certain jurisdictions. *Fourth*, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business. Finally, the U.S. Trustee requires that debtors pay all tax obligations arising after the filing of the petition in full when due.

5.      The relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**I.      *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of Their Premium Financing Agreements and Pay Premiums Thereunder, (IV) Enter Into New Premium Financing Agreements In the Ordinary Court of Business, and Vi) Granting Related Relief (the "Insurance Motion")***

1.      Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business on a postpetition basis.

2.      In the ordinary course of business, the Debtors maintain approximately twelve insurance policies that are administered by various third-party insurance carriers (collectively, the

"Insurance Carriers").   These policies provide coverage for, among other things, the Debtors'

property, general liability, workers' compensation, network security privacy liability, crime,

employment practices liability, and D&O liability, among others  (collectively, the "Insurance

Policies").

3.    The Debtors finance the premiums of certain of the Insurance Policies because it is

not economically advantageous for the Debtors to pay the premiums on such Insurance Policies in

full on or around the start date of each policy period.  The Debtors currently finance their premium

obligations through premium financing agreements (the "Premium Financing Agreements") with

IPFS Corporation ("IPFS").

4.    The aggregate annual amount the Debtors pay on account of premiums for the

Insurance Policies (including amounts paid in connection with financed Insurance Policies under

Premium Finance Agreements) is approximately $897,990.50, not including applicable taxes and

surcharges, deductibles, broker and consulting fees, and commissions.  In addition, the Debtors pay

approximately $9,457.39 annually in finance charges under the premium finance agreements.  The

Insurance Policies generally are one year in length (although certain policies may be longer than one

year based on.

5.    As of the Petition Date, the Debtors believe they owe prepetition amounts totaling

$141,187.08 on account of premiums for the Insurance Policies and Premium Finance Agreement

obligations, $72,439.27 of which will be due and owing within the 21 days after the Petition Date.

By the Insurance Motion, the Debtors request authority to, upon entry of an Interim Order, (i) pay up

to $72,439.27 on account of the premiums for the Insurance Policies and Premium Finance

Agreement obligations, and (ii) pay postpetition amounts owed on account of such obligations as

they become due and payable in the ordinary course.  The Debtors further seek authority to honor,

continue, or renew existing Insurance Policies and Premium Finance Agreements and to enter into new Insurance Policies and Premium Finance Agreements in the ordinary course.

6.      Continuation of the Insurance Policies and Premium Financing Agreements, entry into new insurance policies and premium financing agreements, and payment of related prepetition obligations as required in the ordinary course of business, is essential to the preservation of the value of the Debtors' properties and assets, as well as Bankruptcy Code requirements and the U.S. Trustee Guidelines for chapter 11 debtors.

**J.      *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* (the "NOL Motion")**

1.      The Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures (the "Procedures") related to certain transfers of, or declarations of worthlessness with respect to, Debtor Hooper Holmes, Inc.'s common stock or any Beneficial Ownership therein (any such record or Beneficial Ownership of common stock (the "Common Stock"); and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void ab initio.

2.      As of December 31, 2017, the Debtors estimate that it has approximately $3.7 million of federal NOLs and $1.1 million of state NOLs. These NOLs and certain other Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases. The NOLs and certain other Tax Attributes are of significant value to the Debtors because, in the case of the $3.7 million of federal NOLs and $1.1 million of state NOLs, the Debtors can carry forward such Tax Attributes to offset future taxable income for up to 20 years, thereby reducing their future aggregate tax obligations. NOLs arising before 2018 can offset 100% of future taxable income and NOLs arising in taxable years starting with 2018 can be used to offset

80% of taxable income.  In addition, the Debtors' may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

3.      Implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  Under section 382 of the IRC and corresponding provisions of state law, certain transfers of or declarations of worthlessness with respect to Common Stock prior to the consummation of a chapter 11 plan could cause the termination or limit the use of the Tax Attributes.  As stated above, the Debtors estimate that it have as much as approximately $3.7 million of federal NOLs and $1.1 million of state NOLs as of December 31, 2017, which translate to the potential for material future tax savings or other potential tax structuring opportunities in these chapter 11 cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties-in-interest.  Thus, granting the relief requested herein will preserve the Debtors' flexibility in operating their business during the pendency of these chapter 11 cases and also implementing an exit plan that makes full and efficient use of the Tax Attributes, maximizing the value of their estates.

4.      Additionally, the Procedures do not bar all transfers of or declarations of worthlessness with respect to Common Stock.  The Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to section 382 of the IRC or corresponding provisions of state law and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.  Because of the Tax Attributes' importance to these chapter 11 cases, and consequently all parties-in-interest, the benefits

of implementing the Procedures outweighs subjecting a limited number of transfers to the Procedures.

*[Remainder of page intentionally left blank]*

## **Exhibit C**

### **Committees Organized Prepetition**

None.

## Exhibit D

### Consolidated List of Holders of the Debtors' 30 Largest Unsecured Creditors

  Pursuant to LBR 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The Debtors reserve the right to assert setoff and other rights with respect to any of the claims listed herein. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Rank | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1 | MOORE MEDICAL 1690 NEW BRITAIN AVE FARMINGTON, CT 06032 | PHONE: 800-234-1464 mmregulatoryaffairs@mooremedical.com | TRADE DEBT | | $4,044,334.66 |
| 2 | CANTOR FITZGERALD & CO. 110 EAST 59TH ST., 7TH FL NEW YORK, NY 10022 | CONTACT: DAVID A. PAUL PHONE: 212-610-2298 dpaul@cantor.com | LITIGATION | CUD | $3,961,000.00 |
| 3 | MINUTECLINIC DIAGNOSTIC ONE MINUTECLINIC DRIVE, MAIL STOP: 100 SVD WOONSOCKET, RI 02895 | CONTACT: ANNE LIGHTFOOT PHONE: 866-389-2727 FAX: 401-216-0166 VACCINECONTRACTING@CVSCAREMARK.COM | Trade Debt | | $1,582,139.45 |
| 4 | LABORATORY CORPORATION LAW DEPARTMENT 531 SOUTH SPRING STREET BURLINGTON, NC 27215 | CONTACT: PAMELA EDWARDS PHONE: 336-229-1127 | Trade Debt | | $1,412,622.75 |
| 5 | SPENCER FANE BRITT & BROWNE 1000 WALNUT ST KANSAS CITY, MO 64106 | CONTACT: NATHAN A. ORR PHONE: 816-474-8100 FAX: 816-474-3216 NORR@SPENCERFANE.COM | Trade Debt | | $830,677.17 |
| 6 | ABRIELLA LANIER C/O BALTODANO & BALTODANO LLP 733 MARSH ST., STE 110 LOS ANGELES, CA 90071 | CONTACT: HERNALDO J. BALTODANO PHONE: 805-322-3412 FAX: 805-322-3413 INFO@BALTODANOFIRM.COM | Settlement Agreement | | $750,000.00 |
| 7 | OPTISOM, LLC 2525 CAMINO DEL RIO SOUTH #270 SAN DIEGO, CA 92108 | PHONE: 619-299-6299 Info@optisom.com | Trade Debt | | $658,419.26 |

| Rank | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 8 | CLINICAL REFERENCE LABORATORY 8433 QUIVIRA RD LENEXA, KS 66215 | PHONE: 913-492-3652 FAX: 913-492-6753 | Trade Debt | | $598,074.26 |
| 9 | ENGAGE2EXCEL 149 CRAWFORD ROAD STATESVILLE, NC 28625 | CONTACT: EMILY GATTON PHONE: 508-222-2900 FAX: 508-222-7089 | Trade Debt | | $581,573.27 |
| 10 | HENRY DUBOIS 894 CENTRILLION DRIVE MCLEAN, VA 22102 | PHONE: 703-942-5488 | Employment Agreement | | $429,000.00 |
| 11 | HANSON MEDICAL SYSTEMS 1954 HOWELL BRANCH SUITE 203 WINTER PARK, FL 32792 | PHONE: 407-671-3883 FAX: 407-671-4403 abrown@hansonmed.com | Litigation | | $315,961.34 |
| 12 | BLUE CROSS BLUE SHIELD OF KC 2301 MAIN STREET KANSAS CITY, MO 64108 | PHONE: 816-395-3558 | Trade Debt | | $286,561.67 |
| 13 | WELLNESS CORPORATE SOLUTIONS PO BOX 56346 ATLANTA, GA 30343 | PHONE: 301-229-7555 info@wellnesscorporatesolut | Trade Debt | | $285,798.21 |
| 14 | UNITED PARCEL SERVICE ATTN: CONTRACTS 12380 MORRIS RD ALPHARETTA, GA 30005 | CONTACT: FELICIA ADKINS PHONE: 630-213-9450 | Trade Debt | | $259,458.40 |
| 15 | QUEST DIAGNOSTICS 550 WEST PEACHTREE STREET NORTHWEST STE 1775 ATLANTA, GA 30308 | PHONE: 404-221-0973 | Trade Debt | | $253,665.00 |
| 16 | FEDEX THREE GALLERIA TOWER 13155 NOEL ROAD DALLAS, TX 75240 | CONTACT: ATTN: GENERAL TRADE DEBT PHONE: 412-391-2014 LEGAL.CAESALES@FEDEX.COM | Trade Debt | | $222,661.95 |
| 17 | AMERICAN EXPRESS 1321 COMMERCE ST DALLAS, TX 75202 | PHONE: 214-742-8200 | Trade Debt | | $173,405.26 |
| 18 | STEVEN BALTHAZOR 3092 NOBLE COURT BOULDER, CO 80301 | PHONE: 1-800-528-2122 | Employment Agreement | | $142,811.48 |
| 19 | SALESFORCE.COM INC THE LANDMARK @ ONE MARKET SUITE 300 SAN FRANCISCO, CA 94105 | PHONE: 1-888-747-9736 | Trade Debt | | $142,571.72 |
| 20 | ZIPONGO, INC. 901 BATTERY ST., STE 250 SAN FRANCISCO, CA 94111 | CONTACT: SCOTT E. SMITH PHONE: 415-729-5433 SCOTT.SMITH@ZIPONGO.COM | Trade Debt | | $141,611.60 |
| 21 | HALLMARK 2501 MCGEE TRAFFICWAY, MD 510 KANSAS CITY, MO 64141 | CONTACT: LEA SCOTT PHONE: 816-274-3524 LEA.SCOTT@HALLMARK.COM | Trade Debt | | $132,625.50 |
| 22 | RICHA AHUJA C/O KLEIN LAW GROUP, LLP | CONTACT: ALEXEI SETTLEMENT PHONE: 415-693-9107 | Settlement | | $120,050.00 |

| Rank | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| | 4 EMBARCADERO CTR, STE 3900 SAN FRANCISCO, CA 94111 | FAX: 415-693-9222 | Agreement | | |
| 23 | ALLIED GLOBAL SERVICES, LLC 10901 W 84TH TERR #220 LENEXA, KS 66214 | PHONE: 913-253-7000 | Trade Debt | | $119,881.69 |
| 24 | GRANT THORNTON LLP 33960 TREASURY CENTER CHICAGO, IL 60694-3900 | PHONE: (703) 847-7500 T FAX: (703) 848-9580 | Trade Debt | | $114,340.00 |
| 25 | COLLEGE CROSSING EFGH, LLC C/O POLSINELLI PC 6201 COLLEGE BLVD, STE 500 OVERLAND PARK, KS 66211 | CONTACT: KELLY D. STOHS PHONE: 913-234-7512 FAX: 913-451-6205 KSTOHS@POLSINELLI.COM | Settlement Agreement | | $111,650.00 |
| 26 | ND DATA GROUP OF RI 1459 STUART ENGLAS BLVD SUITE 303 MOUNT PLEASANT, SC 29464 | CONTACT: TOM ANDERSON PHONE: 843-284-0080 | Trade Debt | | $105,075.25 |
| 27 | NETANIUM 116 JOHN STREET SUITE 110 LOWELL, MA 1852 | CONTACT: JUSTIN SAKOVITZ PHONE: 1-888-638-6638 JSAKOVITZ@NETANIUM.COM | Trade Debt | | $101,293.60 |
| 28 | NYSE MARKET 11 WALL STREET NEW YORK, NY 10005 | PHONE: 1-212-656-5505 | Trade Debt | | $93,281.48 |
| 29 | ELIASSEN GROUP LLC 55 WALKERS BROOK DRIVE 6TH FLOOR READING, MA 1867 | PHONE: 800-354-2773 solutions@eliassen.com | Trade Debt | | $91,960.00 |
| 30 | AT&T CORP. ONE AT&T WAY, ROOM 3A176 BEDMINSTER, NJ 07921 | CONTACT: KAREN CAVAGNARO PHONE: 908 234-6150 KM1426@ATT.COM | Settlement | | $91,824.90 |

## Exhibit E

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Amount of Claim (as of August 27, 2018) | Collateral Description and Value |
|---|---|---|---|---|
| 1 | SWK Funding, LLC | 14755 Preston Road Suite 105 Dallas, TX 75254 Attn: Winston Black | $17,657,000 | Substantially all of the Debtors assets subject to customary exclusions |
| 2 | CNH Finance Fund I, L.P. | 2 Greenwich Plaza 4th Floor Greenwich, CT 06830 Attn: Timothy Peters | $4,810,224 | Substantially all of the Debtors assets subject to customary exclusions |
| 3 | Cisco Systems Capital Corporation | P.O. Box 742927 Los Angeles, CA 90074 | $450,000 | All of Debtor's rights in (a) all equipment subject to the Agreement to Lease Equipment No. 10521-MM002-0; (b) all insurance, warranty, and other claims and rights to payment and chattel paper arising out of such Equipment; and ('c) all books, records, and proceeds related to the foregoing. |
| 4 | The Debtors have various collateral secured by liens under various state laws | Various | Various | Various |

**Exhibit F**

**Summary of the Debtors' Assets and Liabilities**

Pursuant to LBR 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of June 30, 2018) | $30.2 million |
| Total Liabilities (Book Value as of June 30, 2018) | $46.8 million |

## Exhibit G

### Summary of the Publicly Held Securities of the Debtors

Pursuant to LBR 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the July 31, 2018.

| | Class of Stock | Issued | Outstanding | Number of Holders[10] |
|---|---|---|---|---|
| 1 | Common Stock | 26,768,498 | 26,768,498 | 690 |

Pursuant to LBR 1007-2(a)(7), the following lists the number shares of common stock of Hooper Holmes, Inc. that are publicly held by the Debtors' officers and directors as of April 15, 2018.

| | Name of Beneficial Owner | Title | Amount of Beneficial Ownership | Percentage of Common Stock Outstanding[11] |
|---|---|---|---|---|
| 1 | Ronald V. Aprahamian | Director | 758,056[12] | 2.83% |
| 2 | Frank Bazos | Director | 68,600 | Less than 1% |
| 3 | Paul Daoust | Director | 189,873 | Less than 1% |
| 4 | Larry Ferguson | Director | 139,976 | Less than 1% |
| 5 | James Foreman | Director | 68,600 | Less than 1% |
| 60 | Thomas Watford | Director | 119,832 | Less than 1% |

---

[10] Holder information for holders of common stock was provided by American Stock Transfer & Trust Company, the Debtors' transfer agent, as of July 31, 2018.

[11] The Percentage of Common Stock Outstanding ownership is based on 26,768,498 shares of common stock outstanding.

[12] This amount includes 60,000 shares held by Mr. Aprahamian as trustee for his late mother's trust.

4842-9682-7505.3

## **Exhibit H**

### **Summary of Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Exhibit I

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to LBR 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Owned or Leased |
|---|---|---|---|
| 560 N. Rogers Rd. | Olathe | KS | Lease |
| 42 Ladd Street | Warwick | RI | Lease |
| 4220 S. Maryland Parkway | Las Vegas | NV | Lease |
| P.O. Box 55 | Cohocton | NY | Lease |

## **Exhibit J**

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside of the United States**

Pursuant to LBR 1007-2(a)(10), the Debtors' books and records and substantially all of the Debtors' assets are located at 560 N. Rogers Road, Olathe, KS 66286.

The Debtors do not hold any assets outside of the territorial limits of the United States as of the Petition Date.

## Exhibit K

### Summary of Legal Actions against the Debtors

Pursuant to LBR 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| Hooper Holmes, Inc. | AT&T Corp | AT&T filed a petition for quantum meruit, open book account, account stated | Parties are in settlement discussions. |
| Hooper Holmes, Inc., Provant Health Solutions, LLC, and Hooper Kit Services, LLC | F.D.I. Medical / Fitness Distributions Inc. (FDI) | FDI filed breach of contract | Parties entered into settlement agreement. Case remains open as F.D.I. is seeking additional payment. |
| Hooper Holmes, Inc.; Provant Health Solutions, LLC | Millennium Consulting, Inc. | Millennium filed a complaint for breach of contract, book account, unjust enrichment, and quantum meruit | Parties are in settlement discussions. Motion for default remains pending. |
| Accountable Health Solutions, LLC, Hooper Holmes, Inc. | Wellness Corporate Solutions, LLC | AHS brought suit against WCS alleging that WCS interfered with the Company's contractual relationships with a customer, WCS countersued AHS for non-payment of certain fees. | On August 1, 2018, the Court entered judgment against the Company in the amount of $346,226.10 and against WCS in the amount of $2.00. Settlement discussions are ongoing. |
| Hooper Holmes, Inc. and Provant Health Solutions, LLC | Laboratory Corporation of America Holdings (LabCorp) | LabCorp has brought claims for breach of contract, account stated, unjust enrichment | Answer and affirmative defenses filed. |
| Hooper Holmes, Inc. | Cantor Fitzgerald & Co. | Cantor has brought suit against Hooper for breach of contract, declaratory judgment, and indemnification | Answer and affirmative defenses have been filed. Discovery has been issued. |
| Hooper Kit Services, LLC | Fisher Scientific Company, LLC | Fischer has filed a breach of contract and unjust enrichment claim against Hooper | Answer and new matter filed. |
| Hooper Holmes, Inc. | Henry Dubois | Dubois has brought claim for breach of contract | Answer and affirmative defenses filed. |
| Hooper Holmes, Inc. | Hanson Medical Systems, Inc. | Hanson and brought claim for breach of contract | Answer and affirmative defenses filed. |
| Hooper Holmes, Inc. | Sarah Hauser | EEOC complaint | Position statement filed. |
| Hooper Holmes, Inc. | Lou Campbell | EEOC complaint | Investigation ongoing. |
| Hooper Holmes, Inc. | College Crossing EFGH, LLC | Non-wage garnishment of business bank account | Motion to quash garnishment filed, hearing set for August 30, 2018. |
| Hooper Holmes, Inc. d/b/a Provant Health | SPF V, LLC; Jack Zwick; R.J. Vasilliou; Aracle Capital, LLC; John Pappajohn | Breach of fiduciary duty | Threatened lawsuit by investors. No lawsuit filed, parties have entered into forbearance agreement. |
| Provant Health Solutions, LLC | Abriella Lanier | California Labor Complaint | Court approved settlement, motion to modify pending. |

## **Exhibit L**

### **Debtors' Senior Management**

Pursuant to LBR 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Mark Clermont, President | Mr. Clermont is the Debtors' president and brings more than two and half decade of leadership experience in global growth operational efficiency, integration and transformation. More recently, Mr. Clermont served as CFO of UpToDate, Inc., a division of Wolters Kluwer, where he provided strategic and transformative leadership that enabled the company to become the global leader in point-of-care clinical decision support. Previously, Mr. Clermont held multiple leadership roles at Mercer Global Investments, a division of Marsh & McLennan Companies, PFPC, Inc. (now BNY Mellon), and First Data Corporation. | November 2015 - Present |
| Kevin Johnson, Chief Financial Officer | Mr. Johnson is the Debtors' chief financial officer and brings more than 20 years of financial leadership experience with both VC-backed and publicly traded companies. Most recently, Mr. Johnson was Chief Financial Officer for MobileAware. Previously, he served in various executive roles at Imprivata, Starent Networks and ProfitLogic. Mr. Johnson began his career at Ernst & Young. | September 2017 - Present |
| James Fleet, Chief Restructuring Officer | Mr. Fleet is the Debtors' chief restructuring officer and has more than 25 years of experience in providing executive leadership and operating and financial restructuring services to companies in a variety of industries. He has been employed by PMCM, an affiliate of Phoenix Management Services, LLC, for nearly twenty years. | March 2018 - Present |
| Marc Salois, Chief Revenue Officer | Mr. Salois is the Debtors' chief revenue officer and brings more than fifteen years of sales leaders to the Debtors. Most recently, Mr. Salois was vice president of Enterprise Sales, East, at Omada Health, where he was responsible for sales, implementation, and account management temas in the Eastern US. Prior to that, Mr. Salois was vice president of sales at meQuilibrium, vice president of sales at HighRoads, and is currently an advisor at Harvard Innovation Labs. | January 2018 - Present |
| Thomas Basiliere, Chief Information Officer | Mr. Basiliere is the Debtors' chief information officer and is responsible for technology-related functions, information security, and product management, including development of new capabilities that improve the impact of clients' workplace well-being programs. Previously, Mr. Basiliere was vice president and chief information officer at Wolters Kluwers Clinical Decision Support division. Prior to that, Mr. Basiliere worked at Deluxe Corporation, Fidelity Investments, Mellon Bank/The Boston Company, and New England Business Services. | June 2014 – Present |
| Ernie Sifford, Senior Vice President, Operations | Mr. Sifford is the senior vice president of operations and is responsible for event coordination, supply chain management, kit manufacturing, quality management, laboratory testing and customer service which support the Debtors' comprehensive workplace well-being solutions. Before joining the Debtors, Mr. Sifford led IT operations at Black & Veatch, a global leader in engineering procurement and construction services. He has also led business integration activities for KGP Logistics' acquisition of Embarq Logistics. | January 2018 - Present |

## Exhibit M

## Debtors' Payroll for the 30 Day Period Following the Filing of the Debtors' Chapter 11 Petitions

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $1,964,000 |
| Payments to officers, directors, and stockholders | $85,000 |
| Payments to financial and business consultants | $140,000 |

**Exhibit N**

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $2,675,000 |
| Cash Disbursements | $3,679,000 |
| Net Cash Loss | $1,004,000 |
| Unpaid Obligations (excluding professional fees) | $0[13] |
| Unpaid Receivables (excluding professionals fees) | $4,090,000 |

---

[13] The Debtors intend to pay for obligations on COD or cash in advance terms after the Petition Date.