Richard J. Bernard
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, New York 10016-1314
Telephone: (212) 682-7474
Facsimile: (212) 687-2329

- and -

John P. Melko (*pro hac vice* pending)
**FOLEY & LARDNER LLP**
1000 Louisiana Street, Suite 2000
Houston, TX 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                        :    Chapter 11
                                              :
HOOPER HOLMES, INC., *et al.*,                :    Case No. 18-23302
                                              :
          Debtors.[1]                         :    (Joint Administration Requested)
                                              :
-------------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER APPROVING
(A) BIDDING PROCEDURES, (B) STALKING HORSE ASSET PURCHASE
AGREEMENT AND BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF
AUCTION, SALE TRANSACTION, AND SALE HEARING, AND (D) ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (II) AN ORDER APPROVING (A) SALE
OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) ENTRY INTO ASSET
PURCHASE AGREEMENT, AND (C) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Hooper Holmes, Inc. (9359); Hooper Distribution Services, LLC (6838); Hooper Wellness, LLC (6005); Accountable Health Solutions, LLC (9625); Hooper Information Services, Inc. (4927); Hooper Kit Services, LLC (8378); and Provant Health Solutions, LLC (8511). The location of the Debtors' corporate headquarters is 560 N. Rogers Road, Olathe, KS 66286.

Hooper Holmes, Inc. and its affiliates, as debtors and debtors-in-possession (collectively, the "**Debtors**" or "**Provant**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), respectfully state as follows in support of this motion (this "**Motion**"):

### Preliminary Statement[2]

1.       The consummation of a value-maximizing, job-preserving, going concern sale of Provant's assets through an expeditious process is the primary purpose of these Chapter 11 Cases.   To that end, Provant entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**")[3] with Summit Health, Inc., as buyer (the "**Stalking Horse Bidder**"), for the sale of substantially all of Provant's assets.   The Stalking Horse APA is attached hereto as **Exhibit B**, and is subject to higher or otherwise better offers as described herein.

2.       As set forth in greater detail below, Provant conducted an extensive and robust prepetition marketing, solicitation, and sales process spanning several months.   Those efforts culminated in Provant entering into the Stalking Horse APA.   Given the exigencies of Provant's business operations and financial condition, and the milestones in the Stalking Horse APA and the Debtors' debtor-in-possession financing agreement (the "**DIP Agreement**"), the immediate sale of Provant's assets as a going concern is the best possible way to avoid a piecemeal liquidation of the assets of Provant's estates, which would result in significantly less value for all stakeholders and likely the loss of jobs for most, if not all, of Provant's employees.

3.       Accordingly, Provant and its advisors developed bidding and auction procedures for the sale of substantially all of its assets (the "**Bidding Procedures**").   Under the Bidding

---

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of James E. Fleet in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated by reference herein.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse APA or the Bidding Procedures Order (as defined below), as applicable.

Procedures, parties may submit bids for the acquisition of substantially all of Provant's assets (the "**Transferred Assets**").  The Bidding Procedures are intended to preserve jobs and the business as a going concern, and generate the greatest level of interest in purchasing the assets resulting in the highest or otherwise best offer for the Transferred Assets.  Provant believes that the Stalking Horse APA and the Bidding Procedures represent the best available option to maximize value for Provant's various stakeholders.

4.    By this Motion, Provant seeks, among other things, an order approving the Bidding Procedures (the "**Bidding Procedures Order**") and a separate order (the "**Sale Order**") approving the sale of the Transferred Assets to the Stalking Horse Bidder or the bidder that submits the highest or otherwise best offer for the Transferred Assets (the "**Sale Transaction**").

## Procedural Background

5.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

6.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

## Jurisdiction and Venue

8.      The United States Bankruptcy Court for the Southern District of New York (the

"**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, dated December 1, 2016.  This is a core proceeding pursuant to 28 U.S.C. §

157(b).  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a

final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

9.      Venue of these Chapter 11 Cases and this Motion are proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105, 363, 365, 503, and 507

of the Bankruptcy Code; Bankruptcy Rules 2002, 6004, and 6006; and Rules 6004-1 and 6006-1

of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") and

the *Amended Guidelines for the Conduct of Asset Sales*, established and adopted by the Court

pursuant to General Order M-383 (the "**Sale Guidelines**").

## Relief Requested

11.     By this Motion, the Debtors seek entry of the Bidding Procedures Order,

substantially in the form attached hereto as **Exhibit A**, (a) authorizing and approving the Bidding

Procedures, substantially in the form attached as Exhibit 1 to the Bidding Procedures Order;

(b) authorizing and approving certain bid protections in favor of the Stalking Horse Bidder;

including a break-up fee and an expense reimbursement on the terms set forth in the Stalking

Horse APA; (c) scheduling the auction for the Transferred Assets (the "**Auction**"), if necessary;

(d) scheduling a hearing with respect to the approval of the sale of the Transferred Assets (the

"**Sale Hearing**") and notices related thereto; (e) authorizing and approving the procedures included in paragraphs 16-25 of the Bidding Procedures Order governing the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assumption and Assignment Procedures**"); (f) approving various deadlines in connection with the foregoing; and (g) authorizing and approving (x) notice of the Auction and Sale Hearing in the form attached as Exhibit 2 (the "**Sale Notice**") to the Bidding Procedures Order, and (y) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors in the form attached as Exhibit 3 to the Bidding Procedures Order (the "**Cure Notice**").

12.     Additionally, at the conclusion of the Sale Hearing, the Debtors also seek entry of the Sale Order[4] authorizing and approving, (a) the sale of the Transferred Assets free and clear of liens, claims, interests, and other encumbrances, (b) the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith, and (c) granting related relief.

## Prepetition Marketing and Sale Process

13.     Provant's pursuit of a going-concern sale transaction began in the second quarter of 2018, following a thorough diligence process by Provant, its Board, and its financial advisor, Phoenix Management Services, regarding strategic alternatives and an evaluation of all options available to Provant in light of its growing liquidity concerns.  On May 8, 2018, Provant retained Raymond James & Associates, Inc. ("**Raymond James**") to serve as its investment banker and to market substantially all of its assets.

---

[4] The proposed Sale Order will be filed with the Court at least 14 days prior to the first date contemplated for the Sale Hearing and will be in form and substance reasonably acceptable to the Debtors and the Stalking Horse Bidder.

14.     Prior to the Petition Date, Provant and Raymond James contacted approximately 259 potential buyers, including 90 strategic buyers (*i.e.*, operating companies interested in expanding their presence in the health-screening and corporate-wellness services industry) and 169 financial buyers (*i.e.*, such as private equity firms), with the aim of attracting one or more bidders for Provant's business or assets.    During this process, interested buyers executed confidentiality agreements and were provided with confidential information describing Provant's business and communicated with Raymond James with respect to preliminary diligence questions.    As a result of these extensive marketing efforts, Provant received four initial indications of interest for substantially all of Provant's assets.    In evaluating the proposals, Provant and Raymond James analyzed, among other things: (i) the consideration offered by each potential buyer; (ii) assets to be acquired, liabilities to be assumed, and proposed treatment of and effect on Provant's labor agreements and related obligations; and (iii) execution risk.

15.     During a second and final round of bidding, which lasted from July 11, 2018 until August 15, 2018, Provant provided these bidders with management presentations and access to an electronic data room containing significant diligence and other confidential information about Provant's business.    Over the course of this round, Provant and Raymond James continued negotiating with the remaining bidders to increase the value of the bids received.

16.     After the completion of the second and final round of bidding, Provant received final bids for substantially all of Provant's assets.    Provant, its Board, and its advisors continued negotiations with these bidders in order to determine the optimal path forward.    After extensive deliberations, significant negotiations with the Stalking Horse Bidder, and multiple rounds of revisions to the terms of the bid, Provant and its Board concluded that they had received the best possible bid for the Transferred Assets as a going concern that would maximize value for all of

6

Provant's stakeholders.  As a result, the Board decided to proceed with the Stalking Horse

Bidder's bid as reflected in the Stalking Horse APA (the "**Stalking Horse Bid**").

<u>**Need for Timely Sale Process**</u>

17.    Provant believes that the auction procedures and time periods set forth in the

Bidding Procedures are reasonable and will provide parties with sufficient time and information

to submit a bid for the Transferred Assets.  In formulating these procedures and time periods,

Provant balanced the need to provide adequate and appropriate notice to parties-in-interest and

potential purchasers with the need to quickly and efficiently sell its assets while they have

realizable value and can be maintained as a going concern.  Furthermore, potential bidders have

had, and will, in accordance with the Bidding Procedures, continue to have access to

comprehensive information prepared by Provant and its advisors and made available in an

electronic data room.

18.    In addition, completion of the sale process in a timely manner will maximize the

value of the Transferred Assets.  The time periods set forth in the Bidding Procedures were

negotiated at arm's length with the Stalking Horse Bidder and are consistent with the strict

milestones imposed under the DIP Agreement.  Thus, the timeline contemplated for the sale

process comports with both the milestones set forth in the Stalking Horse APA and the DIP

Agreement.  Failure to adhere to the proposed time periods could jeopardize the closing of the

Sale Transaction, which the Debtors believe is the best means of maximizing the value of their

assets, maintaining the business as a going concern, and minimizing claims against the Debtors'

estates.  Thus, the Debtors have determined that pursuing the Sale Transaction in the manner

proposed is in the best interests of the Debtors' estates and provides interested parties with

sufficient opportunity to participate.

**<u>Stalking Horse APA</u>**[5]

19.    The Stalking Horse APA represents a binding bid for substantially all of the Debtors' assets.  The total consideration to be realized by the Debtors is $27 million, plus the assumption of certain liabilities, subject to certain adjustments.  In addition, pursuant to the terms of the Stalking Horse APA, the Stalking Horse Bidder and the Debtors will execute a transition services agreement (the "**TSA**"), whereby the Debtors will provide interim services to the Stalking Horse Bidder.  The TSA not only ensures a smooth post-closing transition of the Debtors' business, but also preserves a number of key jobs for existing employees of the Debtors at least through December 31, 2018.

20.    The Transferred Assets include, among other things, certain executory contracts and unexpired leases (the "**Assumed Contracts**") and certain real property, inventory, deposits, furniture and equipment, intellectual property, books and records, and permits.  In the event that the sale to the Stalking Horse Bidder is consummated, the Debtors will assume and assign the Assumed Contracts to the Stalking Horse Bidder.  With respect to cure costs to be paid in connection with the assumption and assignment of the Assumed Contracts (the "**Cure Costs**"), (a) the Stalking Horse Bidder is responsible for paying the first $300,000 of Cure Costs in the aggregate, (b) the Debtors are responsible for paying all Cure Costs in excess of $300,000 in the aggregate and less than $600,000 in the aggregate, and (c) in the event that Cure Costs exceed $600,000 in the aggregate, the Stalking Horse APA provides that (x) the Debtors and the Stalking Horse Bidder will negotiate in good faith to determine the party responsible for paying Cure Costs in excess of $600,000, and (y) the Debtors and the Stalking Horse Bidder may

---

[5] The summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA.  In the event of any conflict between the summary contained herein and the actual terms and conditions of the Stalking Horse APA, the actual terms and conditions of the Stalking Horse APA shall control.

terminate the Stalking Horse APA if they cannot agree on the responsibility for payment of the excess Cure Costs.

21.     The Bidding Procedures provide for standard bid protections, such as an initial overbid amount and subsequent bidding increments.  The Stalking Horse APA also includes a provision for the payment of a break-up fee representing 3.5% of the Purchase Price (the "**Break-Up Fee**") and an expense reimbursement up to a cap of $300,000 (the "**Expense Reimbursement**"), as an administrative expense, upon the termination of the Stalking Horse APA, payable in accordance with the terms thereof.

22.     As described in more detail below, in the event it is not the winning bidder at the Auction, the Stalking Horse Bidder has agreed to act as a "Back-up Bidder" and, as such, hold open its binding offer to purchase the Transferred Assets for a period of time after the Auction in case the winning bid at the Auction is not consummated.

23.     The Stalking Horse APA includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Bidder, as well as certain conditions to closing and rights of termination.  The Stalking Horse APA also includes covenants, conditions, and termination rights related to events in these Chapter 11 Cases.  The transactions contemplated by the Stalking Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Order.

24.     The following chart summarizes the key terms and conditions of the Stalking Horse APA, attached hereto as **Exhibit B**:

| Stalking Horse APA Provision | Summary Description |
| --- | --- |
| **Parties** | Sellers: Hooper Holmes, Inc.; Hooper Distribution Services, LLC; Hooper Wellness, LLC; Accountable Health Solutions, LLC; Hooper Information Services, Inc.; Hooper Kit Services, LLC; and Provant Health Solutions, LLC  Buyer: Summit Health, Inc. |

|  | *See* **Stalking Horse APA, at Title Page and Introduction.** |
|---|---|
| **Consideration** | In exchange for the sale, assignment, transfer, conveyance and delivery by the Debtors of the Transferred Assets, the Stalking Horse Bidder shall provide the consideration (the "**Consideration**"), consisting of cash in the amount of $27,000,000 (the "**Cash Consideration**"), payable upon Closing by wire transfer to an account designated by the Debtors; provided, however, that the Cash Consideration shall be reduced by $150,000 for each day that the Closing is delayed past October 10, 2018 (except to the extent such delay occurs as a result of the Stalking Horse Bidder's breach of its obligations under the Stalking Horse APA).<br><br>*See* **Stalking Horse APA, at § 4.1.** |
| **Bid Protections** | In the event the Court (i) enters an order approving an offer to purchase the Transferred Assets submitted by an Alternative Purchaser, and (ii) such Alternative Purchaser closes on the sale with the Debtors, then the Stalking Horse Bidder will be entitled to receive a break-up fee out of the proceeds of the consummated sale in an amount equal to 3.5% of the Cash Consideration (the "**Break-Up Fee**"), plus the Stalking Horse Bidder's reasonable out-of-pocket expenses, including the fees and expenses of its attorneys and other professionals and advisors incurred in connection with the negotiation, execution and consummation of the Stalking Horse APA (which expenses shall not exceed $300,000) (the "**Expense Reimbursement**").<br><br>*See* **Stalking Horse APA, at § 2.5.** |
| **Deposit** | No later than August 28, 2018, the Stalking Horse Bidder shall post a deposit in the amount of 10% of the Cash Consideration (the "**Deposit**") with the Debtors.  In the event that the Stalking Horse Bidder is the Successful Bidder, the Deposit will be credited against the Cash Consideration at Closing. Subject to the Debtors' rights under Section 11.1 of the Stalking Horse APA, if the Stalking Horse Bidder is not the Successful Bidder, the Deposit shall be returned to the Stalking Horse Bidder on the date on which the closing of a sale to an Alternative Purchaser takes place.<br><br>*See* **Stalking Horse APA, at §§ 1.2, 12.15(gg).** |
| **Transferred Assets** | On the terms and subject to the conditions set forth in the Stalking Horse APA and subject to the exclusions set forth in Section 1.1(b) thereof, at the Closing, the Debtors shall sell, transfer, convey, assign and deliver to the Stalking Horse Bidder, and the Stalking Horse Bidder shall purchase, acquire and take assignment and delivery from the Debtors, all of the Debtors' rights, title and interest in, to and under the assets, properties and rights (contractual or otherwise) owned by the Debtors, excluding only the Excluded Assets (collectively, the "**Transferred Assets**").   The Transferred Assets shall include, without limitation, all of the Debtors' right, title and interest in, to and under the following:<br><br>    i.    all inventory, supplies, equipment, machinery or other tangible personal property ("**Tangible Personal Property**") and any warranty or claims associated therewith;<br>    ii.    all Contracts and Leases of the Debtors set forth on Section 1.1(a)(ii) of the Disclosure Schedule (the "**Assumed Contracts and Leases**"), which Section 1.1(a)(ii) of the Disclosure Schedule may be updated by the Stalking Horse Bidder, in its sole discretion, on or before the day on which the Sale Hearing takes place;<br>    iii.    all Permits transferable to the Stalking Horse Bidder pursuant |

|  | to their terms and in accordance with applicable Laws; |
|---|---|
|  | iv.    all Sellers Intellectual Property; |
|  | v.    all books and records relating to the Transferred Assets or the Business, including customer or client lists, historical customer data, files, documentation and other records, but not including books and records of the type described in Section 1.1(b)(v); provided, however, that the Debtors shall have the right to reasonable access to such books and records acquired by the Stalking Horse Bidder in order to administer their bankruptcy estates; |
|  | vi.    all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Transferred Assets or the Business (other than those constituting the Excluded Assets); |
|  | vii.    all accounts receivable of the Debtors; |
|  | viii.    all deposits and prepayments held by third parties pursuant to any Assumed Contract or Lease; |
|  | ix.    subject to applicable Laws, all specimens, samples, testing and patient records and all records related to the Tangible Personal Property; |
|  | x.    all the Debtors' rights to telephone number(s), email addresses and websites used by the Debtors in connection with the Business; |
|  | xi.    all rights of the Debtors to receive insurance proceeds to the extent that such proceeds are paid after Closing to reimburse the Debtors for damages or losses which occurred on or before the Closing Date to any Tangible Personal Property; |
|  | xii.    the bank accounts of the Debtors listed on Section 6.20 of the Disclosure Schedule (the "**Transferred Bank Accounts**") but excluding any cash in the Transferred Bank Accounts except to the extent necessary to cover checks issued by the Debtors prior to the Closing; |
|  | xiii.    all claims and actions of Sellers arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code ("**Avoidance Claims**"), against vendors or suppliers of the Debtors that (A) provide goods or services to one or more Debtors in the Ordinary Course of Business and (B) will continue to do business with the Stalking Horse Bidder or its Affiliates following the Closing, as more particularly set forth on Section 1.1(a)(xiii) of the Disclosure Schedule (the "**Transferred Chapter 5 Claims**"), which Section 1.1(a)(xiii) of the Disclosure Schedule may be updated by the Stalking Horse Bidder, in its sole discretion, on or before the day on which the Bidding Procedures Order is entered; and |
|  | xiv.    other than any Excluded Assets, all other assets, properties or rights of every kind and description of the Debtors, wherever located, whether real, personal or mixed, tangible or intangible, including all goodwill of Sellers as a going concern and all other intangible property of the Debtors. |
|  | *See* **Stalking Horse APA, at 1.1(a).** |
| **Excluded Assets** | Notwithstanding anything to the contrary in the Stalking Horse APA, the following assets and properties of, or in the possession of, the Debtors (collectively, the "**Excluded Assets**") shall be retained by the Debtors and |

|  | shall be excluded from the Transferred Assets prior to the Closing notwithstanding any other provision of the Stalking Horse APA: |
|--|--|
|  | i.    the Cash Consideration; |
|  | ii.   all cash and cash equivalents in the Transferred Bank Accounts other than as set forth in Section 1.1(a)(xii); |
|  | iii.  any Permits that are not transferable pursuant to their terms and in accordance with applicable Laws; |
|  | iv.   all Contracts and Leases that are not Assumed Contracts and Leases including, without limitation, the Contracts and Leases set forth on Section 1.1(b)(iv) of the Disclosure Schedule (the "**Excluded Contracts and Leases**"), which Section 1.1(b)(iv) of the Disclosure Schedule may be updated by the Stalking Horse Bidder, in its sole discretion, on or before the day on which the Sale Hearing takes place; |
|  | v.    all claims under Chapter 5 of the Bankruptcy Code, including, without limitation, Avoidance Claims, other than the Transferred Chapter 5 Claims; |
|  | vi.   any of the following books and records: corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of the Debtors, all employee-related or employee benefit-related files or records (other than personnel files of the Transferred Employees) and any other books and records that the Debtors are prohibited from disclosing or transferring to the Stalking Horse Bidder under applicable Law or are required by applicable Law to retain; |
|  | vii.  except as set forth in Section 1.1(a)(xi), all insurance policies of the Debtors and all rights to applicable claims and proceeds thereunder; |
|  | viii. all Tax assets (including any tax attributes, duty and Tax refunds and prepayments) of the Debtors or any Affiliates of the Debtors; |
|  | ix.   equity securities or other ownership interests of any of the Debtors; |
|  | x.    any adequate assurance deposit under Section 366 of the Bankruptcy Code; |
|  | xi.   all interests of the Debtors under the Transaction Documents; |
|  | xii.  all Employee Plans; |
|  | xiii. (A) all records and reports prepared or received by the Debtors or any of their Affiliates in connection with the transactions contemplated by the Stalking Horse APA, including all analyses relating to the transactions contemplated by the Stalking Horse APA or the Stalking Horse Bidder so prepared and received, (B) all bids and expressions of interest received from third parties with respect thereto, with respect to or related to the transactions contemplated thereby and (C) all privileged communications between the Debtors and any of their advisors or representatives; and |
|  | xiv.  any other assets, properties and rights set forth on Section 1.1(b)(xiv) of the Disclosure Schedule. |
|  | *See* **Stalking Horse APA, at 1.1(b).** |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in the Stalking Horse APA and subject to the exclusions set forth in Section 1.1(d) thereof, as partial consideration for the Transferred Assets, the Stalking Horse Bidder shall, |

| | |
|---|---|
| | effective at the time of the Closing, assume and thereafter pay, discharge and perform in accordance with their terms, the following Liabilities of the Debtors, as the same shall exist on or after the Closing Date and irrespective of whether the same shall arise prior to, on or following the Closing Date (the "**Assumed Liabilities**"): |
| | i.     Cure Costs not to exceed $300,000 in the aggregate, subject to Section 1.1(e) of the Stalking Horse APA; |
| | ii.    all Liabilities of the Debtors that first accrue and are to be performed from and after the Closing Date under the Assumed Contracts and Leases which relate to periods of time on or after the Closing Date; |
| | iii.   all Liabilities relating to and arising from the Stalking Horse Bidder's operation of the Transferred Assets after the Closing Date; and |
| | iv.    all Liabilities agreed to be performed by the Stalking Horse Bidder pursuant to the terms of any of the Transaction Documents. |
| | *See* **Stalking Horse APA, at 1.1(c).** |
| **Excluded Liabilities** | Notwithstanding any other provision of the Stalking Horse APA, the Stalking Horse Bidder shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or liabilities of the Debtors or relating to the Transferred Assets (or which may be asserted against or imposed upon the Stalking Horse Bidder as a successor or transferee of the Debtors, as an acquirer of the Transferred Assets or as a matter of Law) of any kind or nature, fixed or contingent, known or unknown, other than the Assumed Liabilities, including, without limitation, the following (collectively, the "**Excluded Liabilities**"): |
| | i.     any Liability of the Debtors in respect of any Taxes; |
| | ii.    any Liability of the Debtors under any Contract or Lease that is not an Assumed Contract or Lease; |
| | iii.   except for the Cure Costs assumed by the Stalking Horse Bidder pursuant to Section 1.1(c)(ii), any Liability of the Debtors relating to and arising from the Debtors' operation of the Transferred Assets prior to the Closing; |
| | iv.    any Liability of the Debtors arising out of or resulting from their compliance or noncompliance with any Law; |
| | v.     any Liability of the Debtors arising out of or related to any Legal Proceeding against it and that was asserted on or prior to the Closing Date; |
| | vi.    any Liability of the Debtors arising under or in connection with any Employee Plans of, or maintained or required to be maintained, by the Debtors; |
| | vii.   any Liability of the Debtors to pay any fees or commission to any broker or finder in connection with the transactions contemplated by the Stalking Horse APA; |
| | viii.  any Liability to the extent relating to any Excluded Asset or that is not an Assumed Liability; and |
| | ix.    any Liability not expressly assumed by the Stalking Horse Bidder in the Stalking Horse APA. |
| | *See* **Stalking Horse APA, at 1.1(d).** |
| **Representations, Warranties** | Representations and Warranties of the Debtors |
| | The Stalking Horse APA contains customary representations and warranties, |

| | |
|---|---|
| **and Covenants** | including representations of the Debtors regarding: (a) organization, qualification, and authority; (b) authorization, execution, and delivery of transaction documents; (c) title to and condition of assets; (d) legal proceedings; (e) real property; (f) no violation of laws or agreements; (g) employee and ERISA matters; (h) financial statements; (i) absence of certain changes; (j) contracts; (k) customers; (*l*) intellectual property; (m) labor matters; (n) environmental matters; (o) accounts receivable; (p) prepaid expenses; (q) brokers; (r) permits; (s) insurance; (t) bank accounts; (u) telephone numbers and internet connections; (v) taxes and tax returns; (w) compliance with laws; and (x) undisclosed liabilities.<br><br>*See* **Stalking Horse APA, at §§ 6.1-6.24.**<br><br>Representations and Warranties of the Stalking Horse Bidder<br>The Stalking Horse APA contains customary representations and warranties by the Stalking Horse Bidder regarding: (a) organization, qualification, and authority; (b) authorization, execution, and delivery of transaction documents; (c) brokers; and (d) no violation of laws or agreements.<br><br>*See* **Stalking Horse APA, at §§ 7.1-7.4.**<br><br>Covenants<br>The Stalking Horse APA contains certain covenants related to: (a) the conduct of business; (b) mutual covenants; (c) notification of certain matters; (d) access to information; (e) public announcements; (f) taxes; (g) employees; (h) further assurances; (i) confidentiality; (j) interim reports; (k) survival of representations and warranties; and (*l*) disclaimer of warranties.<br><br>*See* **Stalking Horse APA, at §§ 8.1-8.12.** |
| **Closing Conditions** | Conditions Precedent to Stalking Horse Bidder's Obligation to Close<br>The Stalking Horse APA contains the following conditions precedent to the obligations of the Stalking Horse Bidder: (a) the Debtors' representations and warranties shall be true and correct on and as of the date of the Stalking Horse APA (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date  and without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "material," or "materiality") and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; (b) the Debtors shall have complied with and performed in all material respects all of the agreements and covenants required by the Stalking Horse APA and each other Transaction Document to be performed or complied with by them on or prior to the Closing; (c) the Debtors shall have delivered to the Stalking Horse Bidder a certificate, duly executed by an executive officer of the Debtors (including incumbency certificates), certifying the Debtors' compliance with the conditions set forth in Section 9.1 of the Stalking Horse APA; (d) the Debtors shall have delivered to the Stalking Horse Bidder the Bill of Sale and other transfer documents described in Section 3.1 of the Stalking Horse APA, the Assumption Agreement described in Section 3.2 thereof and the Transition Services Agreement described in Section 3.3 thereof, each duly executed by the Debtors; (e) the Debtors shall have delivered to the Stalking Horse Bidder a true, complete and correct copy of the data room maintained by Merrill DatasiteOne in connection with the transactions contemplated by the Stalking Horse APA; (f) the Sale Order shall have been entered by the Court and must be in effect and must not have been reversed or stayed or be |

14

subject to a motion to alter or amend or other similar filing that remains pending; (g) the Stalking Horse Bidder shall have been deemed the Successful Bidder (as such term is defined in the Bidding Procedures) for the Transferred Assets at any Auction; (h) the Stalking Horse Bidder shall have received all Required Consents set forth on Section 7 of the Disclosure Schedule, which shall be provided by either affirmative consent or operation of law; and (i) since the date of the Stalking Horse APA, there shall have been no Material Adverse Effect to the Transferred Assets or the Business.

***See* Stalking Horse APA, at §§ 9.1-9.8.**

Conditions Precedent to the Debtors' Obligation to Close
The Stalking Horse APA contains the following conditions precedent to the obligations of the Stalking Horse Bidder: (a) each of the representations and warranties made by the Stalking Horse Bidder in the Stalking Horse APA shall be true and correct on and as of the date thereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date and without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "material," or "materiality") and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect on the ability of the Stalking Horse Bidder to timely consummate the transactions contemplated thereunder (including having sufficient funds to pay the Consideration and any other payments, fees or expenses contemplated hereby); (b) the Stalking Horse Bidder shall have complied with and performed in all material respects all of the agreements and covenants required by the Stalking Horse APA and each other Transaction Document to be performed or complied with by it on or prior to the Closing; (c) the Stalking Horse Bidder shall have delivered to the Debtors a certificate, duly executed by an executive officer of the Stalking Horse Bidder (including incumbency certificates), certifying (i) the Stalking Horse Bidder's compliance with the conditions set forth in Section 10.1 of the Stalking Horse APA and (ii) a true and correct copy of the resolutions of the board of directors or other governing body of the Stalking Horse Bidder authorizing the entry into the Stalking Horse APA and the consummation of the transactions contemplated thereby; (d) the Stalking Horse Bidder shall have delivered to the Debtors the Assumption Agreement described in Section 3.2 of the Stalking Horse APA and the Transition Services Agreement described in Section 3.3 thereof, each duly executed by the Stalking Horse Bidder; (e) the Sale Order shall have been entered by the Court and must be in effect and must not have been reversed or stayed or be subject to a motion to alter or amend or other similar filing that remains pending; (f) the Stalking Horse Bidder shall have been deemed the Successful Bidder (as such term is defined in the Bidding Procedures) for the Transferred Assets at any Auction.

***See* Stalking Horse APA, at §§ 10.1-10.5.**

| | |
|---|---|
| **Termination** | The Stalking Horse APA may be terminated and the transactions contemplated therein may be abandoned at any time prior to the Closing:<br><br>a.    by mutual written consent of the Debtors and the Stalking Horse Bidder;<br><br>b.    by either the Debtors or the Stalking Horse Bidder (by written notice given to the other party hereto) if:<br><br>i.    the Bidding Procedures Order is not entered by the |

|  |  |  | Court on or before September 18, 2018; |
|--|--|--|--|
|  |  | ii. | subject to the Debtors' rights under Section 2.2(c) of the Stalking Horse APA, the Court enters an order approving the sale of the Transferred Assets to an Alternative Purchaser; or |
|  |  | iii. | an Excess Cure Cost Situation exists and the parties are unable to resolve such situation consensually in accordance with Section 1.1(e) of the Stalking Horse APA. |
|  | c. |  | subject to the right to cure set forth in Section 11.1 of the Stalking Horse APA, by the Stalking Horse Bidder if the Debtors are in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 9.1 of the Stalking Horse APA shall not be satisfied, and the Stalking Horse Bidder has not waived such condition in writing on or before the Closing Date; |
|  | d. |  | subject to the right to cure set forth in Section 11.1 of the Stalking Horse APA, by the Debtors if the Stalking Horse Bidder is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 10.1 of the Stalking Horse APA shall not be satisfied, and the Debtors have not waived such condition in writing on or before the Closing Date; |
|  | e. |  | by the Debtors or the Stalking Horse Bidder if the Closing shall not have occurred on or before the Outside Date, unless the failure to have the Closing on or before the Outside Date shall be due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing; or |
|  | f. |  | by the Stalking Horse Bidder, if the Sale Order is not entered on or before two (2) Business Days prior to the Outside Date, provided that the failure of the condition set forth in Section 11.2(f) of the Stalking Horse APA was not the result of the actions or omissions of the Stalking Horse Bidder. |
| ***See* Stalking Horse APA, at § 11.2.** |  |  |  |

## Bidding Procedures[6]

### I.    Overview

25.    The Bidding Procedures are designed to maximize value for the Debtors' estates

and will enable the Debtors to review, analyze, and compare all bids received to determine which

---

[6] The summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures provided for in the Bidding Procedures Order.  In the event of any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined herein shall have the meanings set forth in the Bidding Procedures Order.

bid is the highest and best.  The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures.  The Debtors submit that the Bidding Procedures afford them the opportunity to pursue a sale process that will maximize the value of their estates.

26.     A description of certain key elements of the Bidding Procedures is set forth below and is accompanied by, in certain instances, the rationale for the procedures:

a.  <u>Purchase Price; Minimum Bid</u>.  Each Bid submitted must (i) be a Bid for the Transferred Assets, (ii) exceed the Purchase Price by the Minimum Overbid Amount and the Break-Up Fee and Expense Reimbursement, and (iii) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid.

b.  <u>Cancellation of the Auction</u>.  If no Qualified Bid other than the Stalking Horse Bid is received in respect of the Transferred Assets, the Debtors will cancel the Auction and seek approval of a sale to the Stalking Horse Bidder at the Sale Hearing on **October 9, 2018**.

c.  <u>Determination and Announcement of Baseline Bids</u>.  The Debtors shall make a determination regarding (i) which bids have been determined to be Qualified Bids and (ii) the highest or best Qualified Bid for the Transferred Assets (the "**Baseline Bid**") to serve as the starting point at the Auction.

On **October 8, 2018 at 4:00 p.m. (Eastern Time)**, the Debtors shall file a notice designating the Baseline Bid on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room and/or distribute the same at the Auction.

**II.     Key Dates and Deadlines**

27.     The Debtors respectfully request that the Court approve the following timeline for the sale process:

| Action | Deadline |
|---|---|
| Sale Objection Deadline | October 3, 2018 at 4:00 p.m. (Eastern Time) |

| Cure Objections and Adequate Assurance Objections Deadline | **October 3, 2018 at 4:00 p.m. (Eastern Time)**[7] |
|---|---|
| **Bid Deadline** | **October 5, 2018 at 4:00 p.m. (Eastern Time)** |
| **Sale Hearing (if Auction <u>not</u> conducted)** | **October 9, 2018** |
| **Auction** | If necessary, the auction will commence on **October 10, 2018 at 10:00 a.m. (Eastern Time)** at the offices of Foley & Lardner LLP, 90 Park Avenue, New York, New York 10016-1314. |
| **Sale Hearing (if Auction conducted)** | **October 12, 2018** |

28.     In addition, the Bidding Procedures provide for the following sale notice procedures and related deadlines:

a.      Within one (1) day after the entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be filed with the Court and served by email, mail, facsimile, or overnight delivery on: (i) counsel to the official committee of unsecured creditors, if any; (ii) the Office of the United States Trustee for the Southern District of New York; (iii) counsel to the Debtors' prepetition secured lenders; (iv) counsel to the DIP Lenders; (v) counsel for the Stalking Horse Bidder; (vi) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Transferred Assets in whole or in part during the past 12 months; (vii) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Transferred Assets (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtors); (viii) all non-Debtor parties to the Assumed Contracts (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtors); (ix) all affected federal, state, and local regulatory and taxing authorities; (x) the United States Attorney for the Southern District of New York; (xi) the Office of the Attorney General in each state in which the Debtors operate; (xii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (xiii) all of the Debtors' known creditors (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtors); and (xiv) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by the Court (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtors).

---

[7] If a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, then (i) as soon as possible after the conclusion of the Auction, the Debtors will file with the Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assumed Contracts to the Successful Bidder, and (ii) the deadline to file and serve an Adequate Assurance Objection will be extended to the Sale Hearing, but the deadline to object to Cure Costs will not be extended.

b.    Within four (4) business days after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in *The New York Times*, national edition, or *The Wall Street Journal*, with the choice of publication to be determined by the Debtors, in their sole discretion.

29.    The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable.  Under the proposed timeline, there will be 37 days and 39 days between the filing of this Motion and the Sale Objection Deadline and the Bid Deadline, respectively.  This timeline will provide parties with sufficient time to formulate bids to purchase the Transferred Assets. The Debtors' business has been extensively marketed to both strategic and financial buyers before the Petition Date, and information regarding the Debtors' business has been made available in an electronic data room during the process.  As such, many parties that may have an interest in bidding at the Auction likely already have conducted diligence and evaluated the Debtors' business and will not be bidding in a vacuum.  In addition, potential bidders that have not previously conducted diligence on the Debtors' business will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Transferred Assets, including information based upon specific due diligence requests of the Stalking Horse Bidder and other prepetition bidders.

30.    Moreover, there are at least three exigencies requiring an expedited timeline for the Sale Transaction.  *First*, October is a significant revenue-generating month for the Debtors, making an expedited closing essential to maximizing the value of the Sale Transaction for the benefit of the Debtors' estates.  *Second*, due in part to the first point above, the Stalking Horse APA provides that the cash consideration amount of $27 million decreases by $150,000 for ***each day*** that the sale closing is delayed after October 10, 2018.  *Third*, the financing provided by the DIP Lenders requires that the Sale Transaction close no later than October 26, 2018.  In addition, the Debtors believe that the immediate sale of their assets as a going concern is the best possible

way to avoid a piecemeal liquidation, especially in light of the limited post-petition financing available to the Debtors in these Chapter 11 Cases.

### Assumption and Assignment Procedures

31.     The Assumption and Assignment Procedures will, among other things, govern the Debtors' provision of notice to non-Debtor parties to Assumed Contracts that such contracts may be assumed and assigned to the Stalking Horse Bidder (or, if the Auction is held, the Successful Bidder) and of the Cure Costs the Debtors believe are necessary to be paid pursuant to section 365 of the Bankruptcy Code to assume and assign such contracts.

32.     Pursuant to the Assumption and Assignment Procedures, within one (1) day after the entry of the Bidding Procedures Order, the Debtors will file with the Court and serve by first-class mail on each non-Debtor party to the Assumed Contracts the Cure Notice.  Any objection to the proposed Cure Costs set forth on the Cure Notice (a "**Cure Objection**") or to the Stalking Horse Bidder's provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be filed with the Court and served on the Objection Notice Parties by the Sale Objection Deadline.

33.     If the Stalking Horse Bidder is outbid at the Auction, the Debtors will consummate the Sale Transaction with a party other than the Stalking Horse Bidder.  In such event, the Debtors will provide additional notice and opportunity to object to the assumption and assignment of the Assumed Contracts.  Specifically, if a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, then (i) as soon as possible after the conclusion of the Auction, the Debtors will file with the Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assumed Contracts to the Successful Bidder, and (ii) the deadline to file and serve an Adequate Assurance Objection will be extended to the Sale Hearing, but the deadline to object to Cure Costs will not be extended.

## **Extraordinary Provisions under Sale Guidelines**

34. Collectively, the Bidding Procedures and the Stalking Horse APA contain the following provisions, which the Sale Guidelines require to be separately disclosed:

a. <u>Records Retention</u>. The Stalking Horse APA provides that the Stalking Horse Bidder will acquire all books and records relating to the Transferred Assets, including customer or client lists, historical customer data, files, documentation and other records. However, the Stalking Horse APA grants the Debtors the right to reasonable access to such books and records acquired by the Stalking Horse Bidder to allow the Debtors to administer their bankruptcy estates, notwithstanding the sale of any books and records.

b. <u>Sale of Avoidance Actions</u>. The Stalking Horse APA provides that the Stalking Horse Bidder will acquire all claims and actions of the Debtors arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code ("**Avoidance Claims**"), against vendors or suppliers of the Debtors that (i) provide goods or services to one or more of the Debtors and (ii) will continue to do business with the Stalking Horse Bidder after the Sale Transaction is consummated. The Stalking Horse Bidder's acquisition of Avoidance Claims is limited to "ordinary course" Avoidance Claims related to vendors and suppliers that the Stalking Horse Bidder intends to do business with after the Sale Transaction is consummated. Thus, the Debtors' sale of Avoidance Claims is narrowly tailored to those specifically tied to the Sale Transaction, with a view to providing the Stalking Horse Bidder certainty and comfort that the business operations associated with the Transferred Assets will not be hindered by avoidance actions and related liabilities.

c. <u>Requested Findings as to Successor Liability</u>. The Stalking Horse APA requires that the Sale Order contain findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability. The notice that the Debtors propose to provide in connection with the Sale Transaction will conspicuously disclose that the ultimate purchaser of the Transferred Assets will not be liable under theories of successor liability in connection with the Transferred Assets.

d. <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>. The Debtors seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). In light of the current circumstances and financial condition of the Debtors, the Debtors believe that, in order to maximize value and preserve jobs, the sale of the Transferred Assets pursuant to the Sale Transaction must be consummated as soon as practicable.

## Basis for Relief

### I.    Sale of Transferred Assets

35.    Ample authority exists for approval of the sale envisioned by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in this Circuit, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge applying section 363(b) must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  *Gen. Motors*, 407 B.R. at 493-94; *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *In re Betty Owens Sch.*, No. 96 Civ. 3576(PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); *accord In re Delaware and Hudson Ry. Co.*, 124 B.R. 169, 174 (D. Del. 1991).

36.    As described above, an orderly but expeditious sale of the Transferred Assets is critical to preserving and realizing their going concern value and, in turn, to maximizing recoveries for the Debtors' economic stakeholders and preserving jobs at least through December 31, 2018.  A prompt sale is also required by the express terms of the DIP Agreement and the Stalking Horse APA.  Entry into and performance under the Stalking Horse APA represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties.

37.     The notice to third parties that the Debtors propose to provide, as set forth in the Bidding Procedures Order and Bidding Procedures, is more than adequate and reasonable.  The proposed notice will ensure that actual notice of the Auction, Sale Hearing, and Sale Transaction will be provided to all known creditors of the Debtors, in addition to notice by publication. Moreover, this notice, together with authority pursuant to sections 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Transferred Assets, whether it be the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, shall not be liable under theories of successor liability in connection with such Transferred Assets.  The Debtors believe that the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, will give substantial consideration in exchange for a release from successor liability.

38.     The Debtors believe that the consideration under the Stalking Horse APA is fair and reasonable, but the Court and parties-in-interest will be assured at the Sale Hearing, after an extended diligence period and marketing by the Debtors' advisors, that the Debtors will have selected the party with the highest or best offer for the Transferred Assets.  It will also establish that the Debtors and the Stalking Horse Bidder, or any other Successful Bidder, have proceeded in good faith.

**II.     Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

39.     In the interest of attracting the best offer, the sale of the Transferred Assets should be free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits the

sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f)(1)-(5).  With respect to any party asserting a lien, claim, encumbrance, or other interest against the Transferred Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).

## III.   Protections As Good Faith Purchaser

40.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).  *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

41.     The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an open and competitive sale process.  Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## IV.     Bidding Procedures

42.     The Debtors believe that the Bidding Procedures are fair and reasonable and will ensure that the bidding process and the Auction (if necessary) will yield the maximum value for the Debtors' estates and creditors.  The Bidding Procedures allow all parties-in-interest an opportunity to conduct in-depth diligence.  The Bidding Procedures also provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors and their economic stakeholders.  The Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids.  Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

## V.     Break-Up Fee, Expense Reimbursement, and Other Bid Protections

43.     The Bidding Procedures contain certain bid protections for the Stalking Horse Bidder, such as the initial overbid requirement and the subsequent bidding increments.  The Stalking Horse APA contains additional bid protections: the payment of the Break-Up Fee and Expense Reimbursement, payable upon the termination of the Stalking Horse APA on certain conditions contained therein (such Break-Up Fee and Expense Reimbursement, together with the initial and subsequent bid increments, the "**Bid Protections**").

44.     Approval of break-up fees and expense reimbursements as administrative expenses in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to lock in a sale to a

contractually committed buyer at a price the debtor believes is fair, while providing the debtor

with the potential of obtaining an enhanced recovery through an auction process.[8]   Bankruptcy

courts have approved bid protections similar to the ones contemplated in the Stalking Horse APA

under the "business judgment rule," pursuant to which courts typically grant deference to the

actions of a corporation's board of directors taken in good faith and in the exercise of honest

judgment.

45.      The Bid Protections provided in the Bidding Procedures and the Stalking Horse

APA meet the "business judgment rule" standard.    These protections, individually and

collectively, were a material inducement for, and condition of, the Stalking Horse Bidder's entry

into the Stalking Horse APA.  The Stalking Horse Bidder is unwilling to commit to hold open its

offer under the terms of the Stalking Horse APA unless it is assured of payment of the Break-Up

Fee and Expense Reimbursement under the conditions set forth in the agreement.  The Break-Up

Fee and Expense Reimbursement promote more competitive bidding by inducing the Stalking

Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders – and the

Debtors – can rely.  The Stalking Horse Bid increases the likelihood that the price at which the

Transferred Assets are sold will reflect their true worth, and the Stalking Horse Bidder is entitled

to be compensated as a result.  Moreover, the Break-Up Fee and Expense Reimbursement are

fair and reasonable in amount under the circumstances, particularly because, in the event the

---

[8] *See, e.g.*, *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

Break-Up Fee and Expense Reimbursement become payable upon the consummation of a competing bid, they will be paid out of the proceeds of the Sale Transaction consummated pursuant to such competing bid.

46.     The foregoing bid protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

## VI.     Assumption and Assignment of Contracts

47.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

48.     In connection with the Sale Transaction, the Debtors will assume and assign the Assumed Contracts (*i.e.*, the executory contracts or unexpired leases included in the Stalking Horse Bid).   The Debtors' assumption of the Assumed Contracts will be contingent upon payment of the Cure Costs and effective only upon the Closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Assumed Contract after an assignment to the Successful Bidder.   As such, the assumption of the Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

27

49.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court, and serve on each non-Debtor party to an Assumed Contract, a Cure Notice indicating the Debtors' calculation of the Cure Costs for each such contract.  Non-Debtor parties to the Assumed Contracts will have the opportunity to file any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Cost.

50.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote

sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

51.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the Assumed Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Assumed Contracts be approved.

52.     To facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions of the Assumed Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[9]

## VII.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

53.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6006(d).

---

[9] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

54.     In light of the current circumstances and financial condition of the Debtors, as well as the deadlines set forth in the Stalking Horse APA, the Debtors believe that, in order to maximize value and preserve jobs, the sale of the Transferred Assets pursuant to the Sale Transaction must be consummated as soon as practicable.  Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each such order and that the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

55.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Debtors' prepetition secured lenders; (iv) counsel to the DIP Lenders (each as defined in the First Day Declaration); (v) counsel to the Stalking Horse Bidder; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of New York; (ix) all parties to the Assumed Contracts; (x) all entities known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in the Transferred Assets; (xi) all affected federal, state and local regulatory and taxing authorities; (xii) all parties known or reasonably believed to have expressed interest in the Transferred Assets; (xiii) all of the Debtors' known creditors (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtors); and (xiv) all parties that have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## **Motion Practice**

56.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## **No Prior Request**

57.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: August 27, 2018                Respectfully submitted,
      New York, New York

                      /s/ *Richard J. Bernard*
                      Richard J. Bernard
                      **FOLEY & LARDNER LLP**
                      90 Park Avenue
                      New York, New York 10016-1314
                      Telephone: (212) 682-7474
                      Facsimile: (212) 687-2329

                      - and -

                      John P. Melko (*pro hac vice* pending)
                      **FOLEY & LARDNER LLP**
                      1000 Louisiana Street, Suite 2000
                      Houston, TX 77002-2099
                      Telephone: (713) 276-5500
                      Facsimile: (713) 276-5555

                      *Proposed Counsel for the Debtors and Debtors in Possession*